NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220898-U

NO. 4-22-0898

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 31, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Boone County |
| JUAN J. CERDA, | ) | No. 18CF253 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | C. Robert Tobin III, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Justices Steigmann and Zenoff concurred in the judgment.

**ORDER**

¶ 1  *Held*: (1) The trial court did not abuse its discretion in granting the State's motion *in limine* seeking to present evidence establishing defendant's propensity to commit acts of domestic violence.

(2) The trial court's order granting the State's motion *in limine* seeking to present hearsay evidence defendant had committed prior acts of domestic violence against the victim did not deprive defendant of a fair trial, as any potential error was harmless beyond a reasonable doubt.

(3) Defendant failed to establish that his 50-year prison sentence for first degree murder was excessive and an abuse of discretion.

¶ 2  Following a bench trial, defendant, Juan J. Cerda, was convicted of the first degree murder of his wife, Kenia Acosta (Kenia), and sentenced to 50 years' imprisonment. Defendant appeals his conviction and sentence, arguing the trial court (1) erred in allowing the State to introduce propensity evidence pursuant to section 115-7.4 of the Code of Criminal

Procedure (Code) (725 ILCS 5/115-7.4 (West 2020)), (2) erred in allowing the State to present hearsay evidence pursuant to section 115-10.2a of the Code (*id.* § 115-10.2a), and (3) imposed an excessive sentence. We affirm.

¶ 3                               I. BACKGROUND

¶ 4                               A. The Charges

¶ 5        In August 2018, the State charged defendant by bill of indictment with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)) (counts I through III), one count of aggravated domestic battery (*id.* § 12-3.3(a)) (count IV), and two counts of aggravated battery (*id.* § 12-3.05(a)(1), (f)(1)) (counts V and VI). In each count, the State alleged defendant "stabbed Kenia *** about the torso, arms, and neck" on July 13, 2018. With respect to count I, the State alleged defendant caused Kenia's death and acted with the intent to kill her or cause her great bodily harm.

¶ 6                               B. The State's Pretrial Motions

¶ 7        In November 2021, the State filed a motion *in limine* pursuant to section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2020)), seeking to elicit testimony from Kenia's mother, Celia Acosta Perez (Celia), who had been in a 20-year relationship with defendant that ended in 2014. According to the State's motion, Celia would testify regarding instances of domestic violence committed by defendant against her during the course of their relationship for the purpose of establishing his propensity to commit acts of domestic violence. The State also filed three separate motions *in limine* pursuant to section 115-10.2a of the Code (*id.* § 115-10.2a), seeking to present hearsay evidence in the form of testimony from Leah Evans, Alejandro Rivas, and Jose Fernandez regarding statements Kenia made to them describing other acts of domestic violence defendant had perpetrated against her shortly before her death.

- 2 -

¶ 8        Following a hearing, the trial court entered a detailed written order granting the State's motions over defendant's objections. With respect to the State's section 115-7.4 motion, the court concluded the probative value of the proffered evidence was not substantially outweighed by the risk of undue prejudice.

¶ 9                                C. The Bench Trial

¶ 10        On February 14, 2022, defendant waived his right to a jury trial. His bench trial was conducted on May 2, 3, and 20, July 27, and August 4, 2022. Evidence relevant to the issues on appeal is set forth below.

¶ 11                                1. *The State's Evidence*

¶ 12                                a. Sergeant Edward Krieger

¶ 13        Edward Krieger, a sergeant with the Boone County Sheriff's Office, testified that he was dispatched to a trailer park at 5:22 a.m. on July 13, 2018, to conduct a welfare check on Kenia. According to Sergeant Krieger, Kenia's friend and coworker, Jose Fernandez, requested the welfare check after Kenia failed to meet with him as they had agreed. Sergeant Krieger also learned that defendant's niece had requested a welfare check on defendant after receiving concerning text messages from him. Sergeant Krieger testified that he met two other sheriff's deputies at "Trailer No. 35." The officers knocked on the front door of the trailer, but no one responded. The officers discovered that the trailer's two entry doors were locked, and Sergeant Krieger was unable to see into the trailer through the windows. After failing to gain entry into the trailer, Sergeant Krieger requested assistance from the Capron Fire Department. Members of the fire department arrived on the scene shortly thereafter and were able to pry open the front door.

¶ 14        Sergeant Krieger testified that he entered the trailer along with the two other officers. Upon entering, Sergeant Krieger observed bloody footprints on the floor that appeared

to lead to a back hallway. Sergeant Krieger followed the footprints and observed a bedroom to his left with two individuals on the floor and "blood all around them." According to Sergeant Krieger, "The female was on her back and the male was on top of her and they were kind of like holding hands." Sergeant Krieger testified that the male subject, who he identified as defendant in open court, had blood on the bottom of his socks. The officers secured the crime scene and requested assistance from detectives and medical personnel. While securing the scene, Sergeant Krieger discovered three children in the back bedroom.

¶ 15                                b. Dan Moreno

¶ 16        Dan Moreno, a paramedic, testified that at approximately 6 a.m. on July 13, 2018, he, along with two other paramedics, responded by ambulance to a trailer park for a possible suicide. Upon entering the bedroom closest to the trailer's front door, Moreno observed "two patients that were positioned over on top of each other with blood on the walls and carpet." Moreno testified that the "female was in the supine position on her back and the male was positioned over on top of her in the prone position." Moreno observed "multiple lacerations" to the bodies. Moreno testified that the female, later identified as Kenia, "was pulseless, still warm," while defendant, who "had a weak thready pulse, was *** unresponsive." Moreno moved defendant off of Kenia and administered CPR on her "before determining that she had the beginning of rigor mortis setting in." With respect to defendant, Moreno observed "some wounds" on defendant's left arm and a laceration to his neck that was not actively bleeding. After treating defendant's injuries, the paramedics placed him on a stretcher and transported him to the hospital.

¶ 17                                c. Mark Peters

¶ 18          Mark Peters, a forensic pathologist, testified that he performed an autopsy on Kenia on July 16, 2018. Peters "documented nine stab wounds and nine incised wounds." Peters observed a "number of superficial scratches and abrasions and also a contusion on the left arm." Peters characterized two of the wounds to her arm as defensive. He testified that Kenia received a single fatal wound, which he described as a stab wound that went "into the right ventricle of the heart." When shown a picture of "a knife and a box cutter" recovered from the trailer, Peters opined that the fatal wound to Kenia's heart could not have been caused by the box cutter but could have been caused by the knife.

¶ 19                              d. Jose Fernandez

¶ 20          Jose Fernandez testified that he worked at a Speedway gas station in Belvidere with Kenia, Leah Evans, and Alejandro Rivas. On July 4, 2018, around 11 p.m., Fernandez went to the International House of Pancakes (IHOP) with Evans, Rivas, Kenia, and Kenia's three children. Later, Kenia went to the restroom after receiving a phone call. Fernandez testified that Kenia appeared upset after talking on the phone. The next day at work, Kenia showed Fernandez a bruise on her leg that she stated had been caused by defendant hitting her.

¶ 21          Fernandez testified that he picked Kenia up from Evans's apartment on July 12, 2018, and drove her to the police station "to help her get some paperwork and try to fix her situation." Fernandez explained that Kenia told him defendant had threatened to harm himself if she left him. Fernandez further elaborated that Kenia "was always worried about her kids and what would happen so I knew if she did things legally, properly, things would go better for her." Later that same day, at approximately 9:30 p.m., Fernandez, Kenia, Evans, and Rivas went to IHOP again and stayed until around midnight. Shortly after leaving the restaurant, Kenia sent Fernandez a text message asking him to pick her up from Evans's apartment because defendant

was on his way there, and she did not want to see him. Fernandez picked her up, and they drove around for several hours. At approximately 4 a.m., Fernandez dropped Kenia off near the trailer park. Fernandez was "worried something would happen" to Kenia, so he took a screenshot of his phone's homescreen to document the time he dropped her off—an image of the screenshot was admitted into evidence, and it indicated that Fernandez dropped Kenia off at 3:59 a.m. Fernandez testified that they agreed he would wait at a nearby Casey's gas station and call the police if it "took too long" for Kenia to return. When a period of time had passed and Kenia had not returned, Fernandez called the police.

¶ 22                                      e. Rocio Cerda

¶ 23          Rocio Cerda (Rocio), defendant's niece, testified that defendant called her at approximately 5:30 a.m. on July 13, 2018. When Rocio answered the call, defendant said to her, " 'Come get me because I'm dying.' " Rocio asked defendant what he was talking about, but defendant did not respond. Rocio testified that she ended the call with defendant and immediately called her father, defendant's brother, Alvaro Cerda, and then the police. After calling the police, Rocio noticed that she had two unread text messages from defendant—the first was received at 4:37 a.m. and the second at 5:39 a.m. The messages were admitted into evidence and published to the trial court. The message received at 5:39 a.m. read, in part, "But I loved Kenia to death. Tell my kids that I was the best and to forgive me for being a coward." The message received at 4:37 a.m. read:

> "A. 'Rocio, tell my brother that—that I put my kids under his care. I left
> him two papers on the table. It's the custody for my kids and also in regards to my
> properties. All the documents are on the safety box. The keys are in the glove
> compartment—the glove compartment of my truck, my gray truck. And to forgive

me because I couldn't ask for forgiveness from everybody. The papers are on top of the refrigerator and the vehicle titles are in the safety box and the keys for the pickup truck are on top of the refrigerator as well. Forgive me for being a coward but I could not handle—I could not handle this. Tell everybody that I could not allow Kenia—that I could not allow Kenia to live with someone—to live with a lesbian. That's why I did it. I ask for forgiveness to everybody.' "

¶ 24                                f. Celia Acosta Perez

¶ 25          Celia testified that she met defendant when she was 22 years old and lived with him for approximately 24 years. Celia and defendant never married, but they had two children together. Celia also had another daughter, Kenia, from a previous relationship. Celia testified that throughout their relationship, defendant would "hit" her in "many different ways," including with cables and belts. Celia claimed that defendant also "used" a knife on her on multiple occasions and threatened to cut out her tongue if she reported the abuse. Celia testified that she ended her relationship with defendant and moved out of their home in 2014. She indicated that she had attempted to leave defendant on numerous prior occasions due to his abusive behavior, but he would threaten to kill her if she ended the relationship. When she finally decided to leave defendant, Celia asked Kenia to leave with her, but Kenia chose to stay with him.

¶ 26          Celia described a specific instance of abuse that occurred approximately 14 years prior to Kenia's death. According to Celia, on that occasion, defendant became enraged with her because of "jealousy," so he forced her into his vehicle and drove her to a secluded rural location. When defendant parked the vehicle, Celia attempted to flee on foot. Defendant managed to catch her and drag her back to the vehicle, "hitting [her] all the way." Defendant then removed a "folding knife" from his pocket and stabbed Celia's left arm several times. He

told Celia that he wanted to kill her with the knife. At some point, Celia grabbed a picture frame from inside the vehicle to use as a shield against defendant's attacks. Defendant inadvertently struck the picture frame, shattering the glass and causing a shard of broken glass to cut his hand. Because defendant's hand began bleeding, he stopped his assault on Celia and drove to the hospital to seek treatment for his injury. Celia testified that once at the hospital, defendant prohibited her from speaking with a doctor about the stab wounds she had sustained to her left arm.

¶ 27　　　　Celia further testified that defendant called her sometime between 3 a.m. and 4 a.m. on July 13, 2018, and asked her to call Kenia to tell her to pick up their children from the trailer. Defendant explained that he was asking Celia to contact Kenia because Kenia would not answer his phone calls. Celia told defendant that she would try to reach Kenia, but she did not actually do so because she was concerned for Kenia's safety. Celia called defendant approximately 10 minutes after their initial conversation and told him that she was unable to reach Kenia. Defendant informed Celia that Kenia was at the trailer, and then he hung up the phone.

¶ 28　　　　　　　　　　　　g. Jeff Thew

¶ 29　　　　Jeff Thew, a crime scene investigator with the Illinois State Police, testified that he assisted with the death investigation on the morning of July 13, 2018. Thew arrived at the crime scene and met with Sergeant Krieger while they waited for a search warrant. Once the officers obtained the warrant, Thew collected swabs of the bloody footprints in the entryway and took samples of bloodstains on the walls of the bedroom where Kenia's body was located. Thew testified that he found two "bladed objects" under the bed in the same bedroom. Thew described the two objects as a folding pocketknife and a box cutter.

¶ 30        While Thew was processing the scene, another officer pointed out two handwritten letters on top of the refrigerator in the kitchen. The letters, written in Spanish, were admitted into evidence, and an interpreter read them to the trial court:

> "INTERPRETER MUJICA-RUIZ: Okay. This document contains two notes. The first note says 'I, [defendant], *** give custody of my children to my brother, Alvaro Cerda. I ask you not to share custody of my kids, not even to Joanna or Alejandra. Only Alvaro can have custody—total custody of my three children. Attentively, [defendant]. Please take care of them, brother, and forgive me for being a coward. This is for the best. I love you all and please take care of them a lot. Thank you. Tell them I love them all three. You must not let anyone take them from you, brother. Thank you. [Defendant].'
>
> That was the first note.
>
> The second one, 'Brother, forgive me. I don't want my children to see their mom as a lesbian. I don't want my children to suffer any trauma. Forgive me everyone, for this. I don't want them to get close to my body. Joanna or Alejandra or Kenia and Celia, they are the persons [*sic*] that caused me a lot of bad things. Thank you to all. I love you and forgive me please. With Kenia I let—went to—with Kenia to the lesbian's house. I love you.' "

¶ 31                                        h. Edward Rottman

¶ 32        Edward Rottman, a fingerprint examiner with the Illinois State Police, testified that he examined the box cutter and knife found in defendant's trailer for fingerprints. Rottman testified that he was able to identify two prints suitable for comparison on the box cutter and no

prints suitable for comparison on the knife. Rottman opined that the prints on the box cutter matched those of defendant.

¶ 33                                    i. Leah Evans

¶ 34        Leah Evans testified that she met Kenia in 2018 while working at Speedway , and the two of them became friends. Around midnight on July 4, 2018, Evans went to IHOP with Kenia, Fernandez, Rivas, and Kenia's three children. Evans testified that Kenia texted her the next day asking her to come to the gas station because she needed help. When Evans arrived at the gas station, Kenia informed her that defendant "had hit her with his belt" when she returned home from IHOP the previous night. Evans testified that she observed "a welt with a little bit of bruising from the belt on her left calf." Kenia told Evans that defendant "was mad that she went out, thought she was going to go out with a bunch of guys and he had threatened to hurt her again." Kenia also told Evans that defendant had "threatened her with a knife." A few days after this incident, Kenia moved into Evans's apartment. On July 12, 2018, Evans again went to IHOP with Kenia, Fernandez, and Rivas. Afterwards, Evans, Kenia, and Rivas went back to Evans's apartment. While there, Kenia informed Evans she had received a text message from defendant saying he was coming over. Evans told Kenia to leave because she did not think it was safe for her to be there when defendant arrived. Evans testified that Fernandez picked up Kenia and the two of them left the apartment before defendant arrived.

¶ 35                                    j. Alejandro Rivas

¶ 36        Alejandro Rivas testified that he met Kenia in 2018 while working at Speedway. Rivas testified that he went to IHOP with Kenia, Evans, Fernandez, and Kenia's three children at approximately 11 p.m. on July 4, 2018. When Rivas arrived at work the next morning, he noticed that Kenia appeared "[d]istraught" and "kind of scared." Kenia informed Rivas that defendant

"beat" her with a belt when she returned home from IHOP the previous night. Rivas testified that Kenia showed him bruises on her arms and legs. Kenia then stated defendant told her she could not go out with other people and that he threatened to harm her and her friends if he saw her out with them again. Rivas testified that he again went to IHOP with Kenia, Evans, and Fernandez around midnight on July 12, 2018. Around 2 a.m., Rivas, Evans, and Kenia went back to Evans's apartment to sleep. Rivas testified he was awakened about an hour later by the sound of defendant banging on the front door. Evans's brother opened the door, and Rivas heard defendant demand to see Kenia in an "[a]ggressive tone." Evans's brother informed defendant that Kenia was not at the apartment, and defendant left shortly thereafter.

¶ 37                                  k. Dexter McElhiney

¶ 38            Dexter McElhiney, a forensic scientist specializing in biology and DNA, testified that both defendant's and Kenia's DNA profiles were found on the blade of the box cutter and pocketknife, with defendant being the major contributor. Both of their DNA profiles were also found on defendant's socks, with Kenia being the major contributor. McElhiney additionally tested three blood samples collected from stains on the bedroom walls. He testified that Kenia's DNA was found in two of the samples, while defendant's DNA was found in one of the samples.

¶ 39                                  2. *Defendant's Evidence*

¶ 40            Defendant testified on his own behalf. Defendant was 48 years old at the time of trial. He was born in Mexico and attended school for "[m]aybe five months" when he was 10 years old. He testified that he could read and write "[v]ery little" Spanish. According to defendant, he was living in "Trailer No. 35" with Kenia and their three children until she left him on July 5 or 6, 2018. On July 12, 2018, defendant called Kenia to tell her that her children loved her and wanted to stay with her, but, according to defendant, Kenia said that she could not have

- 11 -

them with her. Later that night, he went to Kenia's "new partner['s]" apartment to speak with her. Evans's brother answered the door and informed him that Kenia had left, so defendant returned to his trailer around midnight and put the children to bed. Defendant called Celia and asked her to contact Kenia because he had a job interview in the morning and he needed Kenia to watch the children. Celia informed defendant that she too was unable to reach Kenia. Defendant then went to sleep.

¶ 41        Defendant testified that he was awakened several hours later by the sound of someone banging on the front door. He looked out of the bedroom window and saw a black car that he recognized as belonging to Kenia's new boyfriend. Defendant testified that when he opened the door, Kenia "was coming angry [*sic*] and she came up towards me and I felt—I felt like something was stinging me and it was like something was stabbing me, but I didn't see because the light was off." According to defendant, Kenia told him that she was there with her boyfriend and they were going to kill him because he "was constantly calling *** for her to come and get the children." Defendant ran into the nearest bedroom, with Kenia chasing behind him. Defendant testified that once he made it into the bedroom, "She started stabbing me with the knife and I got a box cutter and I started to defend myself because I was fearing for my life." Defendant described the knife Kenia used as "[o]ne that opens up." He claimed that he never had that knife in his hand. Defendant testified that Kenia stabbed him in the hand, chest, and neck. Defendant stated "[e]verything happened in seconds" and he "felt a lot of pain and then *** lost consciousness." The last thing he remembered before waking up in the hospital was Kenia yelling, "I will take your life."

¶ 42    Defendant denied writing the two letters that were discovered on top of the refrigerator. He testified that the handwriting did not match his own but instead resembled Kenia's. Defendant further testified that he did not recall texting Rocio prior to Kenia's death.

¶ 43                              3. *The Trial Court's Finding*

¶ 44    The trial court ultimately found that the State had proven defendant guilty of all counts beyond a reasonable doubt. Specifically, the court found Kenia's death "was the result of an unsuccessful murder-suicide by the defendant." The court also made the following relevant findings:

> "THE COURT: To begin with, the testimony of the defendant was not credible. It was inconsistent with the real evidence and was illogical given all the other evidence in the case; therefore, the Court gives little or no weight to his testimony. The defendant had a history of domestic violence against Kenia's mother, Celia, as well as Kenia herself. He was controlling and would threaten harm to them if they left him."

¶ 45                              4. *Defendant's Posttrial Motion*

¶ 46    On September 6, 2022, defendant filed a motion for a judgment notwithstanding the verdict or, alternatively, for a new trial. Defendant argued, in part, that the trial court erred in granting the State's motions *in limine*. The court denied the motion.

¶ 47                              D. Sentencing

¶ 48    On September 27, 2022, the trial court conducted a sentencing hearing. A presentence investigation report (PSI) was prepared in advance of the hearing. According to the PSI, defendant was 48 years old at the time of sentencing. He had no criminal history, did not report any substance or alcohol abuse issues, and did not report any gang affiliations. The PSI

further indicated that he had maintained steady employment since 2007 as a landscaper, farmhand, and painter.

¶ 49 The trial court sentenced defendant to 50 years' imprisonment on count I—first degree murder. In doing so, the court stated the following:

> "THE COURT: The Court takes into consideration all the evidence that I heard both at trial and at sentencing, the information provided in the [PSI], the statutory factors in aggravation and mitigation, the nature of the offense, the character of the defendant and the cost of incarceration.
>
> Clearly unusually there's not a lot of mitigation but for the lack of any criminal history. His violence is designated at—it sounds like at best two people but at trial for one person. On the other hand, there's—the nature of the offense itself, it was cold, it was calculating, it was planned and it was the ultimate act of domestic violence."

The court subsequently entered a written sentencing order indicating that counts II through VI merged into count I. Defendant timely filed a motion to reconsider his sentence, which the court denied.

¶ 50 This appeal followed.

¶ 51 II. ANALYSIS

¶ 52 On appeal, defendant argues the trial court (1) erred in allowing the State to present propensity evidence pursuant to section 115-7.4 of the Code, (2) erred in allowing the State to present hearsay evidence that he had committed other acts of domestic violence against the victim pursuant to section 115-10.2a of the Code, and (3) imposed an excessive sentence.

¶ 53 A. The State's Section 115-7.4 Motion

- 14 -

¶ 54        First, defendant argues the trial court erred and deprived him of a fair trial by allowing the State, pursuant to section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2020)), to elicit testimony from Celia regarding other acts of domestic violence he had perpetrated against her for the purpose of establishing his propensity to commit acts of domestic violence. Defendant maintains that the "evidence was inadmissible because it was unduly prejudicial, and its prejudicial effect outweighed any probative value it may have had." Specifically, he asserts his "alleged abuse of Celia was remote in time from his alleged murder of Kenia, was factually dissimilar from Kenia's death, and was irrelevant to the prosecution's theory that [he] planned and then acted on his plan to lure Kenia to the trailer and intentionally kill her."

¶ 55        Initially, we note defendant contends, relying on *People v. Whitehead*, 2023 IL 128051, ¶ 16, we must review his claim *de novo*, as it "presents a question of law involving the construction and application" of section 115-7.4 of the Code. However, the issue in *Whitehead* was whether a stoop in front of an apartment was "a public place of accommodation" pursuant to section 12-3.05(c) of the Criminal Code of 2012 (720 ILCS 5/12-3.05(c) (West 2018)). *Id.* Resolution of the issue required the supreme court to engage in statutory interpretation, which presented a question of law to be reviewed *de novo. Id.* Here, the issue raised by defendant does not involve the trial court's interpretation of section 115-7.4 but instead whether the court erred in balancing the factors set forth in that section. Therefore, we reject defendant's contention and will review his claim using the standard of review generally applicable to questions concerning the propriety of a trial court's evidentiary ruling. "Generally, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion, and reviewing courts will not disturb a trial court's evidentiary ruling absent an abuse of discretion." *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). "An abuse of discretion will be found only where the trial court's ruling is

arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 56    Section 115-7.4 of the Code (725 ILCS 5/115-7.4(a), (b) (West 2020)) permits the trial court to allow evidence of other crimes of domestic violence to establish the propensity of a defendant to commit a crime of domestic violence. It provides the following, in pertinent part:

"§ 115-7.4. Evidence in domestic violence cases.

(a) In a criminal prosecution in which the defendant is accused of *** first degree murder *** when the commission of the offense involves domestic violence, evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant.

(b) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances." *Id.*

"[A]dmissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged." *People v. Illgen*, 145 Ill. 2d 353, 370 (1991). There is no bright-line rule for when other-crimes evidence becomes too remote to be admissible, it is just one factor to consider when weighing its probative value. *People v. Donoho*, 204 Ill. 2d 159, 183-84 (2003). "To be admissible under section 115-7.4, the other-crimes evidence must bear merely general similarity to the charged

- 16 -

offense." (Internal quotation marks omitted.) *People v. Heller*, 2017 IL App (4th) 140658, ¶ 44. "As factual similarities increase, so does the relevance, or probative value, of the other-crimes evidence. [Citation.] Conversely, as the number of dissimilarities increase, so does the prejudicial effect of the other-crimes evidence." *People v. Johnson*, 406 Ill. App. 3d 805, 811 (2010). "Other facts and circumstances" to consider include the difficulty for a defendant to defend himself against the other-crimes evidence and the ability of a jury instruction to cure undue prejudice. *People v. Cardamone*, 381 Ill. App. 3d 462, 494 (2008). "Other-crimes evidence, when relevant, must not become a focal point of the trial. [Citation.] That is, the trial court should not permit a mini-trial of the other, uncharged offense, but should allow only that which is necessary to illuminate the issue for which the other crime was introduced." (Internal quotation marks omitted.) *Johnson*, 406 Ill. App. 3d at 810.

¶ 57        Here, Celia testified that she met defendant when she was 22 years old and lived with him for approximately 24 years. Celia and defendant had two children together. Celia testified that defendant "hit" her in "many different ways" throughout the duration of their relationship. Defendant also "used" a knife on her numerous times. Celia testified defendant would threaten to kill her if she left him and to cut out her tongue if she reported the abuse. According to Celia, this type of abuse occurred until she left defendant in 2014. Celia further testified to a specific instance of abuse that occurred approximately 14 years prior to Kenia's death. Celia stated that defendant became enraged one day because of "jealousy." He drove her to a secluded rural location and began assaulting her. Defendant removed a "folding knife" from his pocket and stabbed her left arm several times while telling her that he wanted to kill her. He did not stop the assault until a shard of glass from a picture frame Celia used to shield herself cut open his hand, requiring him to seek medical treatment.

¶ 58        The trial court ruled that the probative value of Celia's testimony was not substantially outweighed by the risk of undue prejudice. In its detailed written order, the court analyzed each of the factors outlined in section 115-7.4 of the Code—*i.e.*, temporal proximity, degree of factual similarity, other relevant facts and circumstances, and undue prejudice—and found that each factor weighed in favor of admission. With respect to temporal proximity, the court found that although the stabbing incident occurred approximately 14 years prior to Kenia's death, "it was just a part of the repeated and continuing abuse throughout the relationship—which would have culminated only a few years prior to the charged offense." As for factual similarity, the court found that both Kenia and Celia were in a "marriage-like" relationship with defendant and had children with him, defendant "threatened to harm Celia and Kenia as well as their families if they left him," and "defendant also allegedly used a knife to stab both of them." The court further found the "other relevant facts and circumstances" factor favored admission because the "concern about the volume of prior domestic violence and the defendant's ability to defend himself are not present." Finally, the court found there was no risk of undue prejudice because "murdering Kenia" was "immensely worse than the prior domestic violence of Celia" and Celia's testimony would not lead to a "mini-trial," as she would be the only witness to testify.

¶ 59        We cannot say the trial court's ruling amounted to an abuse of discretion. Although the specific instance of abuse to which Celia testified occurred approximately 14 years prior to the charged offense, proximity in time is but one factor to consider, and there is no bright-line rule as to when an event becomes too remote to be admissible. *Donoho*, 204 Ill. 2d at 183-84. In fact, courts of review have consistently affirmed the admission of other-crimes evidence that was similar in its temporal proximity to the instant case. See, *e.g.*, *id.* at 184-85 (12

to 15 years between prior acts and subject offense); *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 37 (20 years between prior act and subject offense); *People v. Davis*, 260 Ill. App. 3d 176, 192 (1994) (20 years between prior act and subject offense). Thus, we do not find that the temporal proximity factor mandated exclusion of the evidence. Importantly, the factual similarities between the acts described in Celia's testimony and the charged offense strongly supported admission of her testimony. As the trial court noted, both Celia and Kenia were in a "marriage-like relationship" with defendant and shared children with him. Celia testified that defendant threatened to kill her if she left him, and Kenia was killed shortly after she left defendant. Celia testified that defendant stabbed her multiple times with a "folding knife," which was the same type of knife that was used to fatally stab Kenia. Moreover, the probative value of Celia's testimony was not substantially outweighed by the risk of undue prejudice. Beyond her general description of defendant's prior abuse of her, Celia provided details only about the stabbing incident, such that her testimony did not lead to a "mini-trial" concerning the other crime, and the stabbing incident involving Celia resulted in relatively minor injuries compared with the fatal injuries inflicted on Kenia. *Johnson*, 406 Ill. App. 3d at 810; *People v. Perez*, 2012 IL App (2d) 100865, ¶ 53 (finding the other-crimes evidence was not unduly prejudicial because it was not "particularly more heinous than the charged conduct").

¶ 60　　　　We find unpersuasive defendant's contention that the other-crimes evidence was factually dissimilar to the charged offense. He asserts that because Celia's stab wounds were non-life-threatening and because defendant never acted upon his threats of killing her if she were to leave him, the conduct was factually dissimilar. However, defendant's assertion ignores the fact that defendant only stopped his assault on Celia when a shard of glass cut open his hand and required him to seek medical treatment. Moreover, the assertion that defendant's prior abuse of

Celia was irrelevant to the issue of whether he acted with the requisite mental state is also unpersuasive. To the contrary, it was probative evidence that he did not act in self-defense, but rather that he was predisposed to resort to violence when confronted with the prospect of a romantic partner leaving him and that he acted intentionally when he stabbed Kenia. Accordingly, we reject defendant's argument and find the trial court did not abuse its discretion by allowing the State to present other-crimes evidence pursuant to section 115-7.4 of the Code.

¶ 61                               B. The State's Section 115-10.2a Motions

¶ 62          Defendant next argues the trial court erred in allowing the State to present hearsay evidence—in the form of testimony from Fernandez, Evans, and Rivas—demonstrating he had committed other acts of domestic violence against Kenia pursuant to section 115-10.2a of the Code (725 ILCS 5/115-10.2a (West 2020)). Specifically, defendant contends "section 115-10.2a did not apply under the facts of this case, and the statute and Illinois Supreme Court rule that did apply did not allow for the admission of such testimony." We find it unnecessary to decide whether section 115-10.2a applied under the circumstances because even assuming, *arguendo*, the court erred in allowing the State to offer hearsay evidence about other acts of domestic violence against Kenia, the error was harmless beyond a reasonable doubt.

¶ 63          "Courts apply the harmless error doctrine to most errors, constitutional and otherwise, to promote the public's confidence and respect for the criminal process by focusing on the underlying fairness of the criminal trial rather than on the presence of inconsequential error." *People v. Jackson*, 2022 IL 127256, ¶ 72. "Harmless-error analysis is based on the notion that a defendant's interest in an error-free trial must be balanced against societal interests in finality and judicial economy." (Internal quotation marks omitted.) *People v. Mullins*, 242 Ill. 2d 1, 23 (2011). "In a harmless-error analysis, *** it is the State that bears the burden of persuasion

with respect to prejudice. [Citation.] In other words, the State must prove beyond a reasonable doubt that the *** verdict would have been the same absent the error." (Internal quotation marks omitted.) *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). In determining whether an error was harmless,

> "a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Becker*, 239 Ill. 2d 215, 240 (2010).

¶ 64    Here, the record shows that the trial court's alleged error in granting the State's section 115-10.2a motions was harmless beyond a reasonable doubt. The properly admitted evidence overwhelmingly supported defendant's murder conviction. Several days before the murder, Kenia moved out of the trailer she shared with defendant and their three children and moved in with her coworker, Evans. Another coworker, Fernandez, subsequently drove her to the police station "to help her get some paperwork and try to fix her situation." During the early morning hours of July 13, 2018, Kenia informed Evans she had just received a text message from defendant saying he was coming over. Evans told Kenia she should leave because she did not believe it was safe for her to stay. Fernandez then picked up Kenia, and the two of them left Evans's apartment. According to Rivas, another coworker who was staying at Evans's apartment that night, he was awakened at about 3 a.m. by loud banging at the door. Rivas stated he heard defendant demand to see Kenia in an "[a]ggressive tone." When told she was not there, defendant left. Fernandez testified that he and Kenia drove around for a while and then dropped her off near the trailer park at approximately 4 a.m. Because he was concerned for her safety, he

indicated he would park nearby and call the police if it "took too long" for her to return. Around this time, defendant called Celia, telling her he was trying to reach Kenia and asked Celia to call her. Celia was concerned for Kenia's safety and did not try to reach her. She called defendant back 10 minutes later at which time defendant said Kenia was there and hung up the phone. Fernandez testified that when Kenia did not return to the car, he called the police.

¶ 65 Sergeant Krieger testified that when he attempted to enter the trailer, the two entry doors were locked, and he was only able to gain entry after the local fire department pried open the front door. Sergeant Krieger found defendant and Kenia on a bedroom floor covered in blood. He stated that Kenia "was on her back and [defendant] was on top of her and they were kind of like holding hands." Thew testified he found a folding pocketknife and a box cutter under the bed in the room where Kenia's body was located when he was processing the crime scene. Defendant's fingerprints were on the box cutter, but no prints suitable for comparison were identified on the pocketknife. Peters, who performed the autopsy on Kenia, testified she had defensive wounds to her arms and suffered "nine stab wounds and nine incised wounds." He opined that the fatal stab wound to her heart could not have been caused by the box cutter but could have been caused by the pocketknife. Rocio testified defendant called her around 5:30 a.m. the day of Kenia's death to tell her that he was dying and needed help. Rocio discovered that she had two unread text messages from defendant that were sent at 4:37 a.m. and 5:39 a.m. In the earlier message, defendant stated that there were two letters for his brother on top of the refrigerator granting his brother custody of his children and title to his property. He further stated: "I could not allow Kenia *** to live with a lesbian. *That's why I did it*." (Emphasis added.) In the texts, neither of which defendant denied sending to Rocio, he asked to be forgiven "for being a coward." Defendant conveyed a similar message in the handwritten letters officers

discovered on the refrigerator. Finally, the trial court heard Celia's testimony that defendant had abused her throughout their 20-year relationship and threatened to kill her if she left him. She also testified to a specific instance in which defendant drove her to a secluded area and stabbed her multiple times in the arm with a "folding knife" while telling her that he wanted to kill her. The evidence overwhelmingly supported the court's finding that Kenia's death "was the result of an unsuccessful murder-suicide by the defendant."

¶ 66      Defendant did not deny stabbing Kenia and causing her death. Instead, he claimed that he acted in self-defense. However, his unsupported self-defense claim was clearly refuted by the State's evidence. Defendant testified that during the early morning hours of July 13, 2018, he was awakened by Kenia banging on his front door. Defendant further testified, "When I opened the door, my wife was coming angry [*sic*] and she came up towards me and I felt—I felt like something was stinging me and it was like something was stabbing me." He then ran into one of the bedrooms, found a box cutter, and began defending himself with the box cutter. According to defendant, Kenia was attacking him with a knife "that opens up," and he claimed to have never touched the knife. He testified that the altercation "happened in seconds" and ended with him feeling "a lot of pain" and then losing consciousness and not regaining it until he was in the hospital.

¶ 67      The trial court found defendant's version of the events "illogical" and gave it no credence. We agree that defendant's self-defense claim was incredible. First, Sergeant Krieger testified that he attempted to gain entry into the trailer but was unsuccessful because both entry doors were locked. As noted above, defendant testified that Kenia entered the trailer, stated that she and her boyfriend were there to kill him and began stabbing him, at which point he ran to a back bedroom. According to defendant, Kenia followed him into the bedroom and repeatedly

stabbed him, after which he lost consciousness. Defendant testified "[e]verything happened in seconds." However, in light of the fact the door was locked when officers arrived, and in order for defendant's version to be true, either he or Kenia would have had to lock the door *while engaged in a knife fight* that lasted mere seconds and ended in a back bedroom with Kenia dead and defendant unconscious. Second, defendant testified that he only used the box cutter and never touched the knife. However, Peters, who performed the autopsy on Kenia, testified that the only fatal wound Kenia suffered was a stab wound to "the right ventricle of the heart," and it could not have been caused by the box cutter. Thus, for defendant's testimony to be true, Kenia would have to have stabbed herself in the heart with the knife. Third, the text messages to Rocio and the letters found on the refrigerator clearly demonstrate defendant's intent to kill Kenia and further refute his self-defense claim. Although defendant denied writing the letters and further claimed they were written by Kenia, he referenced the letters in his text messages to Rocio and was therefore obviously aware of their existence.

¶ 68        In view of the above, the evidence of defendant's guilt was overwhelming. Accordingly, we find the trial court would have found him guilty even without the hearsay evidence of domestic violence presented through the testimony of Fernandez, Evans, and Rivas, and any alleged error in allowing the testimony was harmless beyond a reasonable doubt.

¶ 69                        C. Excessive Sentence

¶ 70        Lastly, defendant argues the trial court imposed an excessive sentence by failing to give proper weight to the applicable mitigating factors. Specifically, defendant notes that the PSI indicated he had no prior criminal history, did not abuse alcohol or drugs, was not affiliated with any gangs, and maintained steady employment.

¶ 71      The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "This constitutional mandate calls for balancing the retributive and rehabilitative purposes of punishment, and the process requires careful consideration of all factors in aggravation and mitigation." *People v. Daly*, 2014 IL App (4th) 140624, ¶ 26. "As long as the court does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors, it has wide latitude in sentencing a defendant to any term within the statutory range prescribed for the offense." *People v. Dominguez*, 255 Ill. App. 3d 995, 1004 (1994). "The existence of mitigating factors does not mandate imposition of the minimum sentence [citation] or preclude imposition of the maximum sentence [citation]." *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). "The most important sentencing factor is the seriousness of the offense." *Id.* at 159.

¶ 72      "Because of the trial court's opportunity to assess a defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age, deference is afforded its sentencing judgment." *Daly*, 2014 IL App (4th) 140624, ¶ 26. "A reviewing court must not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently." *People v. Streit*, 142 Ill. 2d 13, 19 (1991). Instead, we review the trial court's sentence for an abuse of discretion, which occurs "where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).

¶ 73      Here, defendant was convicted of first degree murder and faced a sentencing range of 20 to 60 years' imprisonment. 720 ILCS 5/9-1(a)(1) (West 2018); 730 ILCS 5/5-4.5-20(a) (West 2022). The trial court sentenced defendant to 50 years' imprisonment, which

was within the permissible range. In imposing sentence, the court noted it had considered the evidence presented at trial and sentencing, the information in the PSI, the statutory factors in aggravation and mitigation, the nature of the offense, defendant's character, and the cost of incarceration. The court found that there was "not a lot of mitigation but for the lack of any criminal history." It then went on to highlight defendant's history of domestic violence and the nature of the instant offense, which it described as "cold," "calculating," and "the ultimate act of domestic violence."

¶ 74      Defendant's argument is not that the trial court failed to consider the factors in mitigation he identifies, but that it gave them too little weight. Defendant is essentially asking this court to weigh the applicable factors differently than the trial court. However, courts of review are prohibited from doing just that. See *Streit*, 142 Ill. 2d at 19. Defendant has failed to point to anything that would demonstrate the sentence was greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Stacey*, 193 Ill. 2d at 209.

¶ 75      As noted above, the seriousness of the offense is the most important sentencing factor for the trial court to consider. *Id.* at 159. Here, defendant brutally murdered his wife while their children were in the next room. The evidence at trial established that Kenia suffered nine stab wounds and nine incised wounds, including the fatal stab wound that penetrated her heart. Defendant never took responsibility for his actions and continued to maintain throughout the proceedings that he was the actual victim. Additionally, although the court found that defendant's lack of a criminal history was a factor in mitigation, the evidence at trial showed that defendant had abused his previous girlfriend throughout their 20-year relationship. Given the seriousness of this offense, defendant's history of domestic violence, and the fact that he

received a sentence 10 years below the maximum, we find the court did not abuse its discretion in sentencing him to 50 years' imprisonment.

¶ 76                                    III. CONCLUSION

¶ 77          For the reasons stated, we affirm the trial court's judgment.

¶ 78          Affirmed.