2025 IL App (4th) 241551-U

NO. 4-24-1551

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 16, 2025
Carla Bender
4th District Appellate
Court, IL

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Boone County |
| JUAN J. CERDA, | ) | No. 18CF253 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | C. Robert Tobin III, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justices Steigmann and Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court granted the Office of the State Appellate Defender's motion to withdraw and affirmed the trial court's judgment summarily dismissing defendant's postconviction petition.

¶ 2   Defendant, Juan J. Cerda, appeals the trial court's order summarily dismissing his petition for postconviction relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)). On appeal, defendant's appointed appellate counsel, the Office of the State Appellate Defender (OSAD), moves to withdraw on the basis it can raise no colorable argument the court erred in summarily dismissing defendant's petition. For the reasons that follow, we grant OSAD's motion and affirm the court's judgment.

¶ 3                     I. BACKGROUND

¶ 4   In August 2018, a grand jury returned a bill of indictment charging defendant with, in relevant part, one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)). The

State alleged defendant intentionally killed his wife, Kenia Acosta, on July 13, 2018, by stabbing her "about the torso, arms, and neck."

¶ 5        The State filed the following relevant pretrial motions, all of which were granted by the trial court: (1) a motion to compel defendant to provide a sample of his DNA pursuant to section 5-4-3(a-3.2) of the Unified Code of Corrections (Corrections Code) (730 ILCS 5/5-4-3(a-3.2) (West 2018)); (2) a motion *in limine* pursuant to section 115-7.4 of the Code of Criminal Procedure (Criminal Code) (725 ILCS 5/115-7.4 (West 2020)), seeking to elicit testimony from Kenia's mother, Celia Acosta Perez, who had been in a 20-year romantic relationship with defendant that ended in 2014, for the purpose of establishing defendant's propensity to commit acts of domestic violence; and (3) three separate motions *in limine* pursuant to section 115-10.2a of the Criminal Code (*id.* § 115-10.2a), seeking to present hearsay evidence in the form of testimony from three of Kenia's friends and coworkers—Leah Evans, Alejandro Rivas, and Jose Fernandez—regarding statements Kenia made to them describing acts of domestic violence defendant had perpetrated against her prior to her death.

¶ 6        Defendant waived his right to a jury trial. He asserted the affirmative defense of self-defense at trial. The matter proceeded to a bench trial, and the trial court ultimately found defendant guilty. This court set forth in detail the trial evidence in defendant's direct appeal. *People v. Cerda*, 2023 IL App (4th) 220898-U, ¶¶ 10-42. For purposes of addressing the potential merit of defendant's postconviction claims in this appeal, we provide the following summary of the evidence and findings by the trial court, which are contained in its written judgment finding defendant guilty:

"As further explained below, the Court finds that the death of Kenia Acosta on 7/13/2018 was the result of an unsuccessful murder-suicide by the

defendant. This was the product of a well-thought-out plan that involved a laying-in-wait manner of execution. The defendant was confident that Kenia had to return to the home some time, and when she did, he would execute the plot. As seen from the evidence, the trap was set on the evening of July 12th. The defendant spent much of that night and the early morning of July 13th attempting to get Kenia home so he could put the plan into play. The Court finds the following facts were proven in support of the motive established above.

1. The testimony of the defendant was not credible; it was inconsistent with the real evidence and was illogical given all the other evidence in the case. Therefore, the Court gives little or no weight to his testimony.

2. Defendant had a history of domestic violence against [Celia] as well as Kenia herself. He was controlling and would threaten harm to them if they left him.

3. Kenia became friends with some of her coworkers at Speedway, where she typically worked from 2:00-10:00 p.m. Her friends from work were [Rivas], [Evans] and [Fernandez].

4. On July 4, 2018, after work, [Rivas, Evans, and Fernandez] and Kenia (along with Kenia's three children[)] went to IHOP about 11:00 p.m. When she returned home, the defendant was upset that she went out and he struck her with a belt leaving a mark. He took her truck and cell phone, and he threatened her with a knife. The next day at work, Kenia told [Fernandez, Evans, and Rivas] about the abuse and threats and

showed them the marks on her leg.

5. Kenia moved in with [Evans] about three or four days after the July 4th incident.

6. On July 12, 2018, Kenia told [Fernandez] that the defendant threatened to kill himself if she did not come home. [Fernandez] took Kenia to the police station, so she could tell the police about this threat, because he did not want Kenia to get in trouble for not disclosing that possibility in advance. After they left the police station, [Fernandez] dropped Kenia off at [Evans's], and he went to a family event.

7. Later on that day (about 11:00 p.m.), [Evans, Rivas, Fernandez and] Kenia went to IHOP. When they left IHOP, [Fernandez] left separately, while [Evans, Rivas] and Kenia went back to [Evans's] apartment. When they were at [Evans's]house, the defendant texted Kenia and told her that he was coming to [Evans's] apartment. [Evans] did not think that it was safe for Kenia to be there when the defendant arrived, so they contacted [Fernandez] to come pick her up. Kenia left [Evans's] home with [Fernandez], and they drove around until about 4:00 a.m.

8. Sometime between 2:00-3:00 a.m., the defendant showed up at [Evans's] house and woke [Evans] and her brother up when he began banging on the door. [Evans's] brother answered the door; the defendant told him that Kenia needed to leave their apartment and go home; [Evans's] brother advised him that Kenia was not there and that defendant needed to leave the property or he would call the police.

9. Kenia's mom, Celia, lived in Florida at the time. She was awoken by a call from the defendant in the early morning on July 13, 2018 (between 3:00-4:00 a.m. Illinois time). The defendant directed Celia to contact Kenia and tell her to come to the defendant's home to pick up the kids because he had an interview that morning and the victim was not answering his phone calls. Despite having no intention to do so, she advised the defendant that she would call Kenia. About 10 minutes later, Celia called the defendant back to tell him a fabricated story that Kenia was not answering for her either, but the defendant stated that Kenia just arrived and the defendant hung up on Celia.

10. Meanwhile, [Fernandez] dropped Kenia off at the marital residence in Capron and took a screen shot of the time (3:59 a.m.). [Fernandez] took the screenshot because he was worried about Kenia. She instructed [Fernandez] to call the police if she did not come back out of the home. [Fernandez] went to wait for her at Casey's [(a gas station)] (which was nearby). Kenia did not return, so [Fernandez] eventually called the nonemergency number for law enforcement. Jose did not remember the exact time he called the police, but it appears that [a police officer] was dispatched to the area about 5:20 a.m.

11. Sometime between 5:39 a.m. and 6:00 a.m. that morning, the defendant called his niece, Rocio Cerda. [Rocio] was very close with the family and babysat [Kenia's and defendant's] kids frequently. The phone call consisted of the defendant saying, 'Come get me because I'm dying.'

She asked the defendant what was going on, and he did not respond. Rocio then called her dad, and then she called 911. The call to 911 was about 6:00 a.m. After she received the phone call from the defendant, Rocio noticed that the defendant had sent her two prior text messages that morning[;] one was received at 4:37 a.m. and the other at 5:39 a.m. The texts were in Spanish; the interpreters read those text messages into the record with a summary as follows:

a. 4:37 a.m. text—'Rocio, tell my brother that I put my kids under his care. I left him two papers on the table. It's the custody for my kids and also in regards to [my] properties. All the documents are on the safety box. The keys are in the glove compartment—the glove compartment of my truck, my gray truck. And to forgive me because I couldn't ask for forgiveness from everybody. The papers are on top of the refrigerator and the vehicle titles are in the safety box and the keys for the pickup truck are on top of the refrigerator as well. Forgive me for being a coward but I could not handle this. Tell everybody that I could not allow Kenia to live with someone—to live with a lesbian. That's why I did it. I ask for forgiveness to everybody.'

b. 5:39 a.m. text—'Tell my brother Alvaro…but I loved Kenia to death. Tell my kids that I was the best and to forgive me for being a coward…sorry to everybody…' Rocio clarified that the text also referenced a desire to not let Kenia's mom (Celia) take

- 6 -

the kids.

12. The papers the defendant referenced were found, just as he indicated in his text message, on top of the refrigerator. These handwritten notes were in Spanish and as translated by the interpreter, they said:

    a. 'I, Juan J. Cerda, I give custody of my children to my brother, Alvaro Cerda. I ask you not to share custody of my kids, not even to Joanna or Alejandra. Only Alvaro can have custody—total custody of my three children. Attentively, Juan J. Cerda. Please take care of them, brother, and forgive me for being a coward. This is for the best. I love you all and please take care of them a lot. Thank you. Tell them I love them all three. You must not let anyone take them from you, brother. Thank you. Juan J. Cerda.' 'Brother, forgive me. I don't want my children to see their mom as a lesbian. I don't want my children to suffer any trauma. Forgive me everyone for this. I don't want them to get close to my body. Joanna or Alejandra or Kenia and Celia, they are the persons that caused me a lot of bad things. Thank you to all. I love you and forgive me please. With Kenia I let—went to—with Kenia to the lesbian's house. I love you.'

    b. 'I also give up my rights to Alvaro Cerda so he can sell all my belongings. Attentively Juan J. Cerda.'

13. When law enforcement arrived [at] the residence, the door was locked from the inside and they had to force entry. There were bloody

footprints (later determined to be from defendant's footprints) leading to a room where Kenia was lying dead on her back and the defendant lying on top of her unconscious but breathing. A box cutter and a folding knife were found in the room with blood on them.

14. The evidence testified to by the experts confirmed that Kenia had multiple knife wounds with some of them excise wounds and others were stab wounds. They also found defensive wounds on Kenia. The cause of death was a stab wound to the heart that could *** not have been caused by the box cutter but could have been caused by the folding knife. After killing Kenia, the defendant walked to the front door to lock it. It was likely about this time that he sent the first text message to Rocio referencing the notes on the refrigerator (which he had placed there prior to Kenia returning to the home that morning). He cut himself thereafter with the timing likely being about 5:39 a.m.—when he sent the second text message and called Rocio. He then placed himself on top of Kenia to die. However, the emergency response team arrived shortly thereafter and saved his life."

¶ 7        On September 27, 2022, the trial court sentenced defendant to 50 years of imprisonment. Defendant appealed his conviction and sentence. This court affirmed on direct appeal. See *Cerda*, 2023 IL App (4th) 220898-U.

¶ 8        On July 17, 2024, defendant filed the instant petition for postconviction relief, in which he raised 16 separate claims of alleged denials of his constitutional rights. Defendant raised mostly claims of ineffective assistance of trial and appellate counsel, but he also claimed

he was denied his right to a fair trial because his jury waiver was invalid, the State made improper remarks in its opening and closing statements, and the trial court considered facts not in evidence in reaching its verdict. See U.S. Const., amends. IV, V, VI, XIV; Ill. Const. 1970, arts. I, II. On September 23, 2024, defendant filed an amendment to the petition, in which he claimed Evans, Celia, and Fernandez should not have been allowed to testify, his sentence was excessive, and the State's evidence was only sufficient to prove him guilty of second degree murder. Given the number of postconviction claims, we will not set forth the factual allegations underpinning each claim here but instead will provide the necessary facts when analyzing the potential merit of each claim in the analysis section.

¶ 9       On October 29, 2024, the trial court entered a detailed written order summarily dismissing defendant's postconviction petition on the basis each claim raised therein was frivolous or patently without merit. Defendant appealed, and OSAD was appointed to represent him on appeal.

¶ 10                      II. ANALYSIS

¶ 11       On appeal, OSAD contends it can raise no colorable argument the trial court erred in summarily dismissing defendant's postconviction petition. In its motion to withdraw, OSAD has identified each of the claims raised in defendant's petition and explained why each claim lacks arguable merit.

¶ 12              A. The Act and the Trial Court's Compliance Therewith

¶ 13       The Act provides a method for criminal defendants to "assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9 (2009) (citing 725 ILCS 5/122-1 *et seq.* (West 2006)). A defendant initiates postconviction proceedings

by filing a petition that must, among other things, "clearly set forth the respects in which [the] petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 2024). At the first stage of proceedings, "the trial court independently determines, without input from the State and [w]ithin 90 days after the filing and docketing of the petition, whether the petition is frivolous or is patently without merit." (Internal quotation marks omitted.) *People v. Anderson*, 2015 IL App (2d) 140444, ¶ 11; see *People v. Swamynathan*, 236 Ill. 2d 103, 113 (2010) ("The 90-day time requirement is mandatory and a trial court's noncompliance with the time requirement renders a summary dismissal order void."). A postconviction petition "may be summarily dismissed as 'frivolous or *** patently without merit' pursuant to section 122-2.1(a)(2) [(725 ILCS 5/122-2.1(a) (West 2006))] only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition lacks an arguable legal basis if it is based on "an indisputably meritless legal theory," such as a legal theory "which is completely contradicted by the record." *Id.* "The summary dismissal of a postconviction petition is reviewed *de novo*." *People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 14        Initially, we note that we agree with OSAD no argument can be made the trial court failed to comply with the procedural requirements of the Act in summarily dismissing defendant's petition. The court entered its order within 90 days of the filing of the amendment to the petition and without input from the State—defendant filed the amendment on September 23, 2024, and the court entered its dismissal order on October 29, 2024. See *People v. Watson*, 187 Ill. 2d 448, 451 (1999) ("[W]hen a defendant who has filed an original post-conviction petition subsequently files an amended petition, the 90-day period in which the court must examine the defendant's petition and enter an order thereon is to be calculated from the filing of the amended petition.").

¶ 15                          B. Defendant's Postconviction Claims

¶ 16          Defendant raised a total of 18 claims in his postconviction petition and the

amendment thereto. The majority of the claims alleged ineffective assistance of trial and

appellate counsel. Defendant also raised several claims he was denied a fair trial, a claim

challenging his 50-year prison sentence as excessive, and a claim that the State's evidence was

only sufficient to prove him guilty of second degree murder. For the reasons discussed below, we

agree with OSAD that all of defendant's claims lack arguable merit.

¶ 17                          1. *Defendant's Claims of Ineffective*
                                 *Assistance of Trial Counsel*

¶ 18          Defendant raised nine claims of ineffective assistance of trial counsel. Below, we

discuss in turn why each claim lacks arguable merit.

¶ 19          "To prevail on a claim of ineffective assistance of counsel, a defendant must

demonstrate that counsel's performance was deficient and that the deficient performance

prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36. "More specifically, a

defendant must show that counsel's performance was objectively unreasonable under prevailing

professional norms and that there is a 'reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting

*Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "[A] defendant must establish both prongs

of the *Strickland* test, such that the failure to establish either precludes a finding of ineffective

assistance of counsel." *People v. Cherry*, 2016 IL 118728, ¶ 31. "At the first stage of

postconviction proceedings under the Act, a petition alleging ineffective assistance may not be

summarily dismissed if (i) it is arguable that counsel's performance fell below an objective

standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234

Ill. 2d at 17.

¶ 20                    a. Counsel's Failure to Contest the State's
                 Section 5-4-3(a-3.2) Pretrial Motion for DNA Testing

¶ 21          Defendant claimed counsel was ineffective for failing "to challenge and/or oppose

and present arguments in regards to the State's DNA motion." According to defendant, counsel

failed to inform him of his right to refuse the collection of his DNA. Defendant's claim is

meritless for several reasons. First, subsection a-3.2 of section 5-4-3 of the Corrections Code is

mandatory, and defendant therefore had no right to refuse the collection of his DNA. See 725

ILCS 5/5-4-3(a-3.2) (West 2018). (stating any person arrested and indicted for first degree

murder "shall be required to provide a specimen of blood, saliva, or tissue"). A challenge to the

statute's constitutionality would have been unsuccessful in light of the United States Supreme

Court's decision upholding the constitutionality of an analogous Maryland statute. *Maryland v.*

*King*, 569 U.S. 435, 465-66 (2013) ("When officers make an arrest supported by probable cause

to hold for a serious offense \*\*\*, taking and analyzing a cheek swab of the arrestee's DNA is,

like fingerprinting and photographing, a legitimate police booking procedure that is reasonable

under the Fourth Amendment."). Moreover, defendant failed to explain how the taking of his

DNA prejudiced him, and any attempt to argue prejudice would have been meritless considering

defendant testified Kenia stabbed him, meaning his DNA still would have been present at the

crime scene under his theory of the case.

¶ 22                    b. Counsel's Waiver of Opening Statement

¶ 23          Defendant claimed counsel was ineffective for waiving the opportunity to make

an opening statement because "it allowed the trial court to hear testimony without being aware of

[his] self-defense claim and that may have prejudiced [him] in the eyes of the trial court."

Initially, we note defendant's claim is frivolous on its face, as he merely speculates that

counsel's waiver of making an opening statement "may have prejudiced" him. Such speculation

is insufficient to state even the gist of an ineffectiveness claim. See *People v. Patterson*, 2014 IL 115102, ¶ 81 ("Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced."); *People v. Garcia*, 2024 IL App (1st) 230325-U, ¶ 46 (citing *People v. Johnson*, 2021 IL 126291, ¶¶ 57-58) ("[A]llegations of prejudice based on speculation are insufficient even when a petition is at the first stage of proceedings under the Act."). Defendant's claim is also meritless because the decision to waive opening statements is a matter of trial strategy and generally immune from ineffectiveness claims. See, *e.g.*, *People v. Conley*, 118 Ill. App. 3d 122, 127-28 (1983) ("[W]aiver of opening statements has been recognized repeatedly as a matter of trial strategy ***, particularly in a bench trial."). Even if defendant could arguably satisfy the deficiency prong, it is not arguable he was prejudiced by counsel's decision to waive an opening statement given the overwhelming evidence of his guilt. See *Cerda*, 2023 IL App (4th) 220898-U, ¶¶ 64-68 (conducting a harmless-error analysis).

¶ 24                                c. Counsel's Failure to Object
to Dr. Peters's Use of Table Charts

¶ 25        Defendant claimed counsel was ineffective for failing to object to the use of table charts as an aid in describing the victim's stab wounds by Dr. Mark Peters, a forensic pathologist who performed the autopsy of the victim. The charts listed the length and width of the victim's incised wounds and the length and depth of the stab wounds. Defendant alleged counsel should have objected to Dr. Peters's use of the charts because Dr. Peters did not personally make them and therefore "could not [have] know[n] with certainty if [they] accurately depicted the measurements of the wounds or were even measured correctly." Defendant further alleged counsel's failure to object "caused prejudice where no substantial proof was presented that the individual who made the chart was qualified or the charts were accurate and free from bias and

- 13 -

influence." Defendant's claim is based on pure speculation and lacks arguable merit. See *Patterson*, 2014 IL 115102, ¶ 81; *Garcia*, 2024 IL App (1st) 230325-U, ¶ 46.

¶ 26                d. Counsel's Failure to Hire a Forensic
Pathologist to Perform an Independent Autopsy

¶ 27        Defendant claimed counsel was ineffective for failing to "obtain an independent expert to challenge the testimony and findings of Dr. Peters." Defendant highlighted a portion of Dr. Peters's testimony in which he testified he did not measure the depth of the victim's incised wounds. According to defendant, "counsel's failure to obtain an independent expert was ineffective because Dr. Peters *** provided no medical or expert reasoning as to why he chose not to perform any depth measurements of the wounds." Defendant further alleged that "counsel had the ability to obtain an independent expert to perform independent testing methods which may have provided relevant information and/or results to contradict the prosecution's theory of the events." It appears defendant's allegations amount to a claim that counsel was ineffective for failing to hire a forensic pathologist to perform an independent autopsy on the victim. However, defendant's claim is based on pure speculation that an independent autopsy would have yielded helpful evidence and therefore lacks arguable merit. See *Patterson*, 2014 IL 115102, ¶ 81; *Garcia*, 2024 IL App (1st) 230325-U, ¶ 46.

¶ 28                e. Counsel's Failure to Challenge
the Search Warrant for Defendant's Cell Phone

¶ 29        Defendant claimed counsel was ineffective for failing "to challenge the sufficiency of the warrant of law enforcement officials in regards to obtaining information from [his] cellphone." In support of his claim, defendant highlighted a portion of the testimony of David Bird, a police officer with the Belvidere Police Department. Bird testified that he performed an extraction on Rocio's cell phone with her consent, which is how the State was able

to introduce the text messages defendant had sent to her around the time of the victim's death. Contrary to defendant's assertion, the State did not present any evidence that it had searched defendant's phone. Thus, defendant's claim has no arguable basis in fact. See *Hodges*, 234 Ill. 2d at 16.

¶ 30                             f. Counsel's Failure to Hire
                      an Independent Expert to Swab for DNA

¶ 31          Defendant claimed counsel was ineffective for failing "to obtain an independent expert to swab the carpeted area within the bedroom for other possible DNA evidence." He alleged "counsel's failure to obtain an independent forensic expert to perform an independent examination of the crime scene and perform additional chemical swabbing which may have produced relevant evidence was ineffective." Defendant's claim is based on pure speculation that such an independent forensic expert would have provided helpful evidence and lacks arguable merit. See *Patterson*, 2014 IL 115102, ¶ 81; *Garcia*, 2024 IL App (1st) 230325-U, ¶ 46.

¶ 32                      g. Counsel's Failure to Hire an Independent
                      Expert to Challenge the State's DNA Evidence

¶ 33          Defendant claimed counsel was ineffective "for failing to subject the State's forensic evidence to a full adversarial test by failing to obtain an independent forensic expert to challenge the results in regards to the testing and DNA evidence." He alleged that "had trial counsel obtained an independent forensic expert to perform independent testing, a test may have produced a possible third-party profile which may have linked to Kenia's boyfriend and if so would have changed the trial court's view in regards to [his] claim of self-defense." Defendant's claim is based on pure speculation that such an independent forensic expert would have provided helpful evidence and lacks arguable merit. See *Patterson*, 2014 IL 115102, ¶ 81; *Garcia*, 2024 IL App (1st) 230325-U, ¶ 46.

¶ 34                            h. Counsel's Failure to
                        Argue His Motion for Directed Verdict

¶ 35        Defendant claimed counsel was ineffective for failing to "present any evidence or arguments" in support of his motion for directed verdict. Defendant's claim is meritless. Given the overwhelming evidence of his guilt, no argument can be made that a reasonable probability exists the trial court would have entered a directed verdict if counsel had presented an argument in support of his motion. See *Cerda*, 2023 IL App (4th) 220898-U, ¶¶ 64-68.

¶ 36                    i. Counsel's Failure to Hire a Handwriting Expert

¶ 37        Defendant claimed counsel was ineffective "for failing to obtain an expert in handwriting to support [his] testimony he did not write the letters." Defendant further alleged that "had trial counsel obtain[ed] an expert to examine, fingerprint, and do handwriting samples and comparisons, the results may have substantiated [his] testimony." Defendant's claim is based on pure speculation that a handwriting expert would have provided helpful evidence and lacks arguable merit. See *Patterson*, 2014 IL 115102, ¶ 81; *Garcia*, 2024 IL App (1st) 230325-U, ¶ 46. We also note defendant acknowledged writing the letters in the text messages he sent to Rocio, and he did not deny sending the messages. *Cerda*, 2023 IL App (4th) 220898-U, ¶ 67.

¶ 38                    2. *Defendant's Claim He Was Denied a Fair Trial*

¶ 39        Defendant also claimed he was denied a fair trial because (1) the State made improper remarks in its closing statement, (2) the trial court considered facts not in evidence in reaching its verdict, (3) his waiver of his right to a jury trial was invalid, and (4) Evans, Celia, and Fernandez were not "proper" witnesses and should not have been allowed to testify.

¶ 40                            a. Prosecutorial Misconduct

¶ 41        Defendant claimed he was denied a fair trial where the State made improper remarks in its closing argument by describing his wounds as "self-inflicted" and the attack as

"torture," despite there having been no evidence presented at trial that he stabbed himself or tortured the victim. "Every defendant is entitled to a fair trial free from the prejudicial comments by the prosecution." *People v. Young*, 347 Ill. App. 3d 909, 924 (2004). "The State is afforded a great deal of latitude in presenting closing argument and is entitled to argue all reasonable inferences from the evidence." *People v. Moore*, 358 Ill. App. 3d 683, 693 (2005). "Further, improper comments can constitute reversible error only when they engender substantial prejudice against defendant such that it is impossible to say whether or not a verdict of guilty resulted from those comments." *Id.* Here, the State's remarks amounted to reasonable inferences drawn from the evidence, and, even assuming the remarks were improper, no argument can be made they led to the guilty verdict. See *Cerda*, 2023 IL App (4th) 220898-U, ¶¶ 64-68.

¶ 42          b. The Trial Court's Reliance on Facts Not in Evidence

¶ 43          Defendant claimed the trial court violated his right to a fair trial by relying on facts not in evidence in reaching its verdict. Specifically, defendant challenged the court's finding that he "cut himself" because "no evidence or testimony was presented that [his] wounds were self-inflicted." Our supreme court "has held that the deliberations of the trial judge are limited to the record made before him during the course of the trial." *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962). "In a bench trial, it is the function of the trial court to determine the credibility of witnesses, weigh the evidence, draw reasonable inferences therefrom, and resolve any conflicts in the evidence." *People v. Petrov*, 2023 IL App (1st) 160498, ¶ 54. Here, no argument can be made it was improper for the court to draw the reasonable inference that defendant's wounds were self-inflicted. *Id.*

¶ 44          c. Invalid Jury Waiver

¶ 45          Defendant claimed he was denied a fair trial because his jury waiver was invalid

due to the trial court's inadequate admonishments regarding the nature of the charge against him. Specifically, defendant alleged his jury waiver was invalid because the court did not use the "exact" language of the first degree murder statute when admonishing him as to the nature of the charge. Although OSAD neglected to address this claim in its motion to withdraw, we nonetheless find it indisputably meritless. Aside from there being no requirement that a trial court recite the statutory language setting forth a criminal offense verbatim when informing a criminal defendant of the nature of the offense charged, defendant's claim is also meritless because the allegations in his petition are wholly irrelevant to the question of whether he understood his jury waiver meant the facts of his case would be determined by a judge and not a jury. See *People v. Bannister*, 232 Ill. 2d 52, 69 (2008) ("When a defendant waives the right to a jury trial, the pivotal knowledge that the defendant must understand—with its attendant consequences—is that the facts of the case will be determined by a judge and not a jury.").

¶ 46                          d. Testimony of Evans, Celia, and Fernandez

¶ 47          Although not entirely clear, it appears defendant claimed he was denied a fair trial where Evans, Fernandez, and Celia were allowed to testify at his trial. Specifically, defendant alleged Evans should not have been allowed to testify because she did "not have firsthand knowledge of the crime nor was [she] present when the crime was committed." Defendant's claim is based on an indisputably meritless legal theory, and we decline to address it beyond noting Evans's testimony had nothing to do with what occurred at the crime scene. Next, defendant alleged Fernandez should not have been allowed to testify because his "story" was not corroborated by the police. Again, defendant's claim is based on an indisputably meritless legal theory. There is no requirement that testimony must be corroborated for it to be admissible; indeed, uncorroborated testimony, standing alone, can be sufficient to sustain a conviction under

certain circumstances. See *People v. Cruz*, 162 Ill. 2d 314, 348 (1994) ("The basic rule is that all relevant evidence is admissible unless otherwise provided by law."); *People v. Mack*, 25 Ill. 2d 416, 420-21 (1962) (stating uncorroborated testimony alone may be sufficient to sustain a conviction). Lastly, defendant alleged Celia should not have been allowed to testify because she "was not a witness at all[;] she was [his] ex relationship for 20 years." Assuming defendant's claim can be characterized as an attempt to argue the trial court erred in allowing Celia to testify as a propensity witness, this court previously affirmed the court's grant of the State's section 115-7.4 pretrial motion, and defendant's claim is therefore barred by the doctrine of *res judicata*. See *People v. Harris*, 206 Ill. 2d 1, 12 (2002) ("Issues that were raised and decided on direct appeal are barred by the doctrine of *res judicata*."); *Cerda*, 2023 IL App (4th) 220898-U, ¶¶ 54-60.

¶ 48                                  3. *Excessive Sentence*

¶ 49        Defendant claimed his 50-year prison sentence was excessive where the State recommended a 40-year sentence at his sentencing hearing. However, we rejected defendant's excessive-sentence claim on direct appeal, and it is therefore barred by the doctrine of *res judicata*. See *Harris*, 206 Ill. 2d at 12; *Cerda*, 2023 IL App (4th) 220898-U, ¶¶ 70-75.

¶ 50                                  4. *Second Degree Murder*

¶ 51        Defendant claimed the evidence presented at trial "constitute[d] not only self-defense but if charge [*sic*] it should be the charge of second-degree murder" because "the witness Fernandez and Kenia had made a plan to provoke or harm" him. Defendant's claim is meritless. As the trial court stated in its written order, "the Court did not believe much of [defendant's] testimony at trial and did not support any argument of self-defense." Moreover, defendant forfeited this claim by failing to raise it on direct appeal. See *People v. Blair*, 215 Ill.

2d 427, 443-44 (2005) (noting that in an initial postconviction proceeding the doctrine of forfeiture bars claims that were or could have been raised on direct appeal).

¶ 52                    5. *Ineffective Assistance of Appellate Counsel*

¶ 53        Finally, defendant claimed appellate counsel was ineffective for failing to raise on direct appeal the claims advanced in his postconviction petition. However, because we have determined each of the claims in his petition lack arguable merit, his claim of ineffective assistance of appellate counsel likewise lacks arguable merit. See, *e.g.*, *People v. Pingelton*, 2022 IL 127680, ¶ 64 ("Appellate counsel is not obligated to brief and argue every conceivable issue on appeal, and a defendant cannot claim prejudice based on appellate counsel's failure to raise an issue that is not meritorious.").

¶ 54                            III. CONCLUSION

¶ 55        For the reasons stated, we grant OSAD's motion to withdraw and affirm the trial court's judgment.

¶ 56        Affirmed.