2026 IL App (1st) 240761-U

FOURTH DIVISION
Order filed: June 18, 2026

No. 1-24-0761

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 9934 |
| | ) | |
| ANTHONY ROBINSON, | ) | Honorable |
| | ) | John Fitzgerald Lyke, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE QUISH delivered the judgment of the court.
Presiding Justice Navarro and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction and 50-year sentence for first degree murder is affirmed over his contentions that he received ineffective assistance of counsel at trial, the circuit court used its mistaken belief regarding the evidence as an aggravating factor during sentencing and the circuit court abused its discretion in admitting four other-crimes incidents between defendant and his ex-girlfriend and in denying defendant's motion for a mistrial.

¶ 2    Following a jury trial, defendant Anthony Robinson was convicted of the first degree murder of Amber Smith and sentenced to 50 years' imprisonment. On appeal, defendant argues that (1) his trial counsel was ineffective; (2) the circuit court relied on improper aggravating factors

during his sentencing hearing when it misremembered the evidence at trial; (3) the circuit court abused its discretion by admitting evidence of prior domestic violence incidents between defendant and a former girlfriend; and (4) the circuit court abused its discretion by denying one of defendant's motions for a mistrial. For the following reasons, we affirm.

¶ 3                                    I.    BACKGROUND

¶ 4     On February 1, 2020, Amber Smith was found deceased in her apartment near Humboldt Park in Chicago. The medical examiner later determined that she died by strangulation. Defendant, who was dating Smith in the months leading up to her death, was later arrested and charged with first degree murder.

¶ 5     Before trial, the State filed a motion to admit proof of other crimes. The State sought to admit evidence of three incidents between defendant and his ex-girlfriend and mother of his second child, Verlia Jones. The State argued that evidence of the prior incidents was admissible to show motive, intent, absence of mistake or accident, *modus operandi* and defendant's propensity to commit acts of domestic violence under 725 ILCS 5/115-7.4(a) (West 2022). Defendant objected, arguing that the evidence was more prejudicial than probative and not factually similar.

¶ 6     The State's motion alleged that the first incident occurred on Father's Day in 2015 when defendant struck Jones with a closed fist and tried to push her over a banister while she held their child outside defendant's parents' home. The second incident occurred later in 2015 when defendant came to Jones's home uninvited and pushed her. After the second incident, defendant threatened Jones that "he would bash her head in with a bat and a hammer," "slice her throat with a knife and slice their son's throat," and would "kill her whole family." Jones went to defendant's apartment a day after the threats and observed a set of knives "just laying out." The third incident

occurred on April 14, 2017, when defendant threw Jones against a brick wall and tried to strangle her and then threw her "to the ground and started choking her and punching her." Defendant pled guilty to battery resulting from the third incident.

¶ 7     After a hearing, the circuit court granted the State's motion. The court weighed the factors set forth in 725 ILCS 5/115-7.4(b) and found that all three incidents were proximate in time to the charged offense and relevant, the first and third incidents were similar in nature to the allegations in the present case with the third incident "extremely similar to the victim in this case," and the second incident and the threats following it were "generally similar enough to come in as well." The court concluded that all three incidents were admissible to show defendant's motive, intent, absence of mistake or accident, *modus operandi* and propensity under 725 ILCS 5/115-7.4(a).

¶ 8     The State later filed a supplemental motion to admit evidence of a fourth incident between defendant and Jones. This included a series of threatening text messages and voicemails defendant sent to Jones between May 6 and July 6, 2018. Jones had previously obtained an order of protection against defendant that expired on May 8, 2018. On July 6, 2018, defendant sent Jones a text message stating "be careful cuz I promise U I'm not showing mercy when fate bring us around each other, even I gotta kill u both and go down for it dats on me but U ain't gone get away with the wrong I've done me, I hope y'all going to die together." The same day, defendant left Jones a voicemail stating that he was "going to f*** her up." Jones reported the messages to the Chicago Police Department.

¶ 9     The circuit court heard arguments on the State's supplemental motion and granted it in part over defendant's objection. The court found that evidence regarding the order of protection was not admissible, as the prejudicial impact "overpowers any probative value it may have." The court

admitted the remaining portions of the incident for motive, intent, absence of mistake, and propensity.

¶ 10    The matter proceeded to a seven-day jury trial. Defendant was represented by two attorneys from the Office of the Cook County Public Defender, Marijane Placek and Claudia Bertacchi. The evidence at trial established that defendant and Smith had been dating for approximately four to six months at the time of Smith's death. Defendant lived in Kankakee, Illinois with his parents. Smith lived in a three-bedroom apartment on Evergreen Avenue near Humboldt Park in Chicago with two roommates, Christianne Hende and Tyler Johnson.

¶ 11    Hende testified that she was at the apartment when defendant and Smith arrived at approximately 2:00 p.m. on January 31, 2020. Hende was in her room with the door closed, but she heard Smith and defendant arguing, with Smith telling defendant "it was just a joke." Smith ran past Hende's bedroom door into Smith's bedroom. Smith and defendant continued arguing in different areas of the apartment, and Hende heard Smith tell defendant "to step away from her." Hende left the apartment at 3:00 p.m. to go to work and checked in with Smith before she left. She testified that she did not want to leave because she did not feel Smith was in a safe situation.

¶ 12    Hende returned to the apartment at approximately 6:00 p.m. She noticed Smith's door was closed with the light on. Hende assumed Smith was sleeping, which she often did after work. Hende went to her room and closed her bedroom door. Approximately 20 minutes later, Hende heard the front door of the apartment open and close. When she left her room, she saw that Smith's bedroom door was still closed, but the light had been turned off.

¶ 13    Johnson testified that she returned to the apartment at 6:45 p.m. Johnson knocked on Smith's door, but heard no response. Hende, Hende's boyfriend Weslie Jackson, and Johnson went

to the gym around 7:00 p.m. The three returned to the apartment between 8:00 and 8:30 p.m. Smith's bedroom door was still closed with the light off and no one else was in the apartment.

¶ 14    Earlier that day, Smith, Hende, and Johnson discussed going to a concert that evening at 8:00 p.m. Smith received free tickets from a male friend named Trell. Johnson testified that they did not go to the concert because they did not know where Smith was. Johnson texted Smith and did not receive a response so she "assumed that [Smith] just stayed hanging out with [defendant] so we did other things." Hende and Jackson went to a party. Johnson testified that she drove to pick up her friend Shanika Dixson and returned to the apartment. Hende testified that she and Jackson returned to the apartment later in the evening. Tyree Huges, Johnson's friend, arrived at the apartment between midnight and 1:00 a.m.

¶ 15    Johnson testified that, at approximately 1:00 a.m. on February 1, 2020, she opened Smith's door to allow two kittens out of Smith's room. The door was only cracked open, but Johnson could see Smith was in bed laying on her stomach with her arm hanging off the bed and the covers pulled over her. Johnson thought Smith was sleeping, so she closed the door. Johnson opened Smith's door again at approximately 4:00 a.m. to allow the kittens back into Smith's room. Johnson observed Smith's body in the same position as before and closed the door. Johnson did not see anyone else open Smith's door or go inside Smith's room that evening.

¶ 16    Hende and Johnson both woke up at approximately 8:00 a.m. on February 1, 2020. Johnson heard the kittens crying from Smith's room and thought Smith would let them out. After about 30 minutes, Johnson walked to Smith's door to ask Smith if she heard the kittens. Johnson opened the door and walked to the bed to tap on Smith's shoulder. Smith was in the same position as before.

When Johnson touched Smith's body, it "felt cold" and Johnson noticed that Smith's hand "was turning purple." Johnson "started freaking out" and "screaming for help."

¶ 17    Hende testified that she was in the shower when she heard Johnson screaming that Smith was not responding. Hende ran to Smith's room, where she saw that Smith was nude and lying face down in the bed with her arm hanging over the pillow and the covers pulled up to her head. Hende and Johnson pulled the covers off Smith and tried to wake her up. Hende "panicked" and tried to pick her up.  Hende testified that when she tried to do so, Smith's body was "hard" and "cold." Johnson saw that a pillow was stuck to Smith's face and there was blood "[a]ll on the pillow" and her mouth and nose. Hende observed that "[i]t looked like [Smith] had been crying too, like she had tears that were dried up on her face."

¶ 18    Johnson called the police and Smith's mother, Anna Long. Jackson testified that he tried to contact defendant through social media, but was unable to contact him because "it seemed like I was already blocked." Johnson called a friend who knew defendant "and asked him if he could try to get in contact with [defendant]." No one in the apartment was able to reach defendant. Hende testified that they tried to look up defendant's social media accounts, but it was "like he had taken them down." Hende acknowledged that, a few days after Smith's death, she made a post on social media asserting that defendant killed Smith. Hende later deleted the post after being told by police to do so.

¶ 19    Chicago Fire Department paramedic Josh Wiseman testified that he responded to the apartment on February 1, 2020. When he arrived, he observed Smith lying face down on a bed with blood next to her mouth. Wiseman and his partner moved Smith's body by rotating the body on its back. When doing so, they observed that rigor mortis had set in such that the body and limbs

were stiff, which indicated that she had been dead for some time. Wiseman and his partner pronounced Smith dead on arrival, as any resuscitative efforts would have been futile.

¶ 20    On February 2, 2020, defendant voluntarily came in to a Chicago Police Department ("CPD") station with his mother, Victoria Sidney ("Victoria"), and his stepfather, Lawrence Wilkin, where he was interviewed by CPD detectives John Korolis and Nick Xanos. Defendant's interview was video recorded and clips of it were played at trial.

¶ 21    In the interview, defendant stated that he was at a doctor's appointment the morning of January 31, 2020 when he received a text from an unknown number. Smith texted him later and admitted that she sent that text. Defendant and Smith argued about the messages. Defendant stated that he met up with Smith near her work on the north side of Chicago, and their conversation turned into a "heated argument" while they took the bus to Smith's apartment and they broke up. They returned to Smith's apartment at around 2:00 p.m. where they continued arguing. Defendant stated that Smith never had "energy" for him, but did for her friends and he was upset she was going to a concert that evening. Smith told defendant to "back up," started pushing him and told him to "get out."

¶ 22    Defendant stated that he began walking out of the apartment, but Smith followed him and yelled at him in the hallway. Defendant said that they grabbed each other's wrists and were "tussling" and he "tried to give her a hug." Eventually, the two calmed down and had sex. When asked by the detectives how they went from "tussling" to having sex, defendant said "it just happened." Defendant stated that after they had sex, he fell asleep. When he woke up, Smith was in a different position than where she was when he fell asleep. Defendant asserted that Smith was alive when he left the apartment because she was breathing and "grunted" when he left.

Defendant's phone battery was dead when he woke up. He estimated that it was close to 5 p.m. when he left.

¶ 23    Defendant tried to take a 5:30 p.m. train home, but missed it. He went to his friend Jeremy Hawkins's house instead. Defendant's cousin, Kolawole Sidney ("Kolawole"), was also at Hawkins's house. Defendant texted Smith at approximately 9:40 p.m., but did not receive a response. Defendant believed they were still broken up. Defendant stated that he was "pissed off" about the breakup and it was a "no brainer" to deactivate his social media accounts afterwards. At the conclusion of the interview, Korolis took a buccal swab of defendant to obtain a DNA sample, and defendant left without being placed under arrest. Korolis testified that defendant did not mention that he and Smith engaged in "rough sex" or anything about consensual chokeholds.

¶ 24    Dr. Marta Helenowski, an assistant medical examiner, testified that she supervised Smith's autopsy, which was performed by a trainee. Dr. Helenowski testified that petechiae were present in Smith's facial area. She explained that petechiae are micro-hemorrhages on the face or mouth caused by "vascular congestion," which is when "blood is obstructed going to the face." She explained that one way this could happen is "due to the neck being compressed." Dr. Helenowski stated that Smith's body also had "stigmata of strangulation," specifically contusions on the underside of the chin and hemorrhaging down to the center of Smith's neck. She testified that "it would take significant force" to cause that kind of injury. The injury would have taken sustained pressure on her neck, which would first cause unconsciousness "within seconds to minutes," and then death within minutes. Dr. Helenowski testified that there was no trauma observed near Smith's genitalia or anus. Smith had no defensive wounds.

¶ 25 As part of the autopsy, a blood sample was sent for a toxicology screen. Dr. Helenowski explained that they "pended" the case rather than determine a cause and manner of death at the time of the autopsy pending the toxicology results. Those results indicated that metabolites of cocaine and THC were present in Smith's blood. Dr. Helenowski stated that neither substance contributed to Smith's death. After receiving the toxicology report, the medical examiner determined the cause of Smith's death was strangulation and the manner of death was homicide.

¶ 26 DNA swabs were taken from Smith's neck, breasts, fingernails, vagina, and anus. Testing on the vaginal and anal swabs detected the presence of semen. Defendant was included in the male profiles detected in the swabs from Smith's neck, vagina, and anus. Testing of Smith's fingernails detected a partial DNA profile with at least one male contributor, but no conclusions could be drawn from that sample.

¶ 27 On the fourth day of trial, one of defendant's attorneys, Bertacchi, fell ill and went to the hospital by ambulance. The circuit court noted that this did not occur in front of the jury. Placek moved for a mistrial, arguing that Bertacchi had helped prepare the case and the Public Defender's office would not allow Placek to finish the trial alone. The circuit court observed that Bertacchi was not visibly ill while the jury was present and she had not questioned any of the State's witnesses or given the opening statement. The circuit court denied the motion for a mistrial, but recessed the trial until the next day to see if Bertacchi was able to return. The trial continued the next day with only Placek appearing on behalf of defendant and without any comment on the record on Bertacchi's status.

¶ 28 Chicago Police Detective Thomas Beebe was the lead detective responsible for investigating Smith's death. He testified that it was originally categorized as a "death

investigation," but, after the medical examiner's conclusion as to the cause of death, it was recategorized as a homicide investigation in April of 2020. Beebe obtained defendant's phone records from Verizon. Beebe requested that CPD officers Kyle Young and Nick Gilbert extract and analyze data from Smith's and defendant's cell phones.

¶ 29    Gilbert testified to the contents of the text messages on January 3, 2020 extracted from defendant's phone. Defendant sent Smith a screenshot of a message stating "Hey baby" that he received from an unknown number and asked Smith if she knew who sent it. Defendant texted Smith that he did not "need sh** like dis." Smith initially denied sending the message and stated that defendant had "fans." Defendant sent a screenshot demonstrating that he had blocked the number, and then Smith admitted that she sent the message.

¶ 30    Defendant stated that he would not hesitate to tell Smith if the message was real, "but don't ever f***ing play wit me like dat again" and "I won't trust u again if u play wit me." Defendant added that Smith should "be careful with that sh**", but that he could "admit that was kind of funny." Smith maintained that the message was a joke. Smith then texted defendant that she "might go to a concert tonight." Defendant asked who she was going with. Smith responded that it was with "the group chat that I'm in" and added that "[t]he guy who had that party is the dj." Defendant responded that Smith was "funny" because she "play[ed]" with him "then u say that." Defendant then texted "enjoy life baby." The two then began arguing about defendant's perception that Smith had time to send him fake texts, but did not have time to "communicate clearly." Defendant texted "f*** dat," "u were testing me" and "don't play wit me." Smith maintained that it was a joke and "not a test." The two also argued about Smith going to the concert. The conversation ended at

- 10 -

approximately 1:00 p.m. on January 31, with defendant texting "we need to talk" and Smith telling defendant that she would "call [him] when I get off" work.

¶ 31    The next text message between the two phones was sent from defendant's phone at approximately 9:30 p.m., in which defendant stated that his phone was on and he was charging it. Defendant's phone later sent two texts to Smith's phone at around 11:00 p.m. On the morning of February 1, defendant sent additional messages asking Smith to call him. Smith's phone did not respond to any messages after 1:00 p.m. on January 31.

¶ 32    Defendant's phone records also contained an exchange with Kolawole. At approximately 11:00 a.m. on February 1, 2020, Kolawole texted defendant "you know you never said what was going on with you but I'm glad you got it off you and where you go." Defendant responded, "Kola it's best I didn't." Gilbert testified that he could not locate these messages in the data extracted from defendant's phone. This could have been because the messages were deleted. Gilbert testified that on February 6, 2020, defendant changed phone numbers.

¶ 33    FBI Special Agent Jeremy Bauer conducted a historical cell site analysis of the location of defendant's phone. Using defendant's cellular records, Bauer traced the approximate location of defendant's phone on January 31 and February 1, 2020, based on interactions between defendant's phone and the cellular network. At approximately 2:00 p.m. on January 31, defendant's phone was located on the north side of Chicago. Between 2:00 and 2:30 p.m., defendant's phone travelled southbound towards the Evergreen apartment. Defendant's phone was located near the Evergreen apartment from approximately 2:30 p.m. until approximately 6:10 p.m. Between 6:10 p.m. and 9:30 p.m., there was no cell site information available. Bauer explained that this was likely because the phone was not connected to the network, which could have been caused by the phone being

turned off or placed in airplane mode. At 9:30 p.m., defendant's phone was reconnected to the network and was located near Hawkins's home.

¶ 34    Defendant was arrested outside of his parents' home in Kankakee on September 17, 2020. Beebe then conducted a second video recorded interview of defendant. Beebe acknowledged that defendant's second interview was consistent with his first interview in several respects, including that defendant stated he and Smith had consensual sex before he left the apartment. Beebe testified that defendant also stated that they argued about the text messages "which he perceived to be her trying to entrap him with flirting with another girl" and her plans to attend a concert that day. During the second interview, defendant was asked how "deep" of a chokehold he would perform while he and Smith had sex, and defendant responded that it was not that deep and demonstrated that he would just place his hands on Smith's neck. Defendant testified that it never reached the point where Smith would pass out. His last physical contact with Smith was having sex and he remembered choking her during sex. Defendant described the different sexual positions he and Smith were in, ending with them having sex "from the side" while defendant used an "arm bar." Defendant stated that after they finished, they "just laid there" and did not talk. He could feel that Smith was breathing at that point.

¶ 35    Molly Link was called as a witness to the third incident in the State's other-crimes motion. Link did not recall witnessing any altercation between Jones and defendant on April 18, 2017, but agreed that body-worn camera footage from a responding officer accurately reflected what she told the officer on that date. In the footage, Link told the officer that she was watching television when she heard a woman screaming outside. Link looked out her window and saw a man on top of a woman with the woman saying, "get off me."

¶ 36    Next, Jones testified that she dated defendant off and on between 2014 and 2016, and they had a son born in April 2015. Jones stated that she took her son to visit defendant on June 21, 2015, which was Father's Day. At that time, defendant lived with his parents in Chicago. When Jones arrived, defendant was not there, so she went to the basement and called defendant's cell phone. Defendant's phone was in the basement and Jones "picked it up and went through it." Jones saw that defendant was communicating with the mother of his first child. Jones went outside to her car to wait for defendant and left the baby with defendant's parents. While in the car, Jones called the mother of defendant's first child to determine whether they were still dating "so I could have my confirmation to not deal with him anymore."

¶ 37    Defendant arrived and approached Jones, who told defendant she did not want to talk. Defendant "kept insisting that [Jones] speak with him" and the "conversation got a little bit aggressive." At that point, Jones wanted to leave, so she tried to go in the house to get the baby. Defendant "started getting angry because [Jones] didn't want to talk to him and yelled" at her. Once Jones tried to leave, defendant began pushing Jones in the chest towards a banister along the front steps of the house. Jones was holding the baby when defendant pushed her.

¶ 38    Jones left the baby with Wilkin because defendant was pushing her and walked away from the house. Defendant kept trying to push Jones, so she swatted his hand. Defendant punched Jones in the head with a closed fist. Jones ultimately called the police because defendant had taken her keys. Police arrived and spoke with Jones and defendant's parents. Defendant had run away and was not on the scene when police arrived. After speaking with police, Jones retrieved the baby and her car keys and left.

¶ 39     The second incident occurred late summer or early fall of 2015 outside of Jones's mother's house. Jones told defendant she had a flat tire. Defendant insisted that he would come to change the tire, but Jones refused defendant's help because she felt it was unsafe to be around him. Defendant came to the house anyway and began trying to fix Jones's tire using Jones's tire iron. Jones and defendant argued and Jones tried to get defendant to drop the tire iron. Jones testified that it did not get "physical," but defendant pushed her. Defendant began walking down the alley and they continued to argue. Jones eventually went inside and defendant left without further incident.

¶ 40     Jones testified that, after that second incident, defendant began threatening her. Initially, the threats were "light threats" where defendant would say that she would be "sorry" and threatening not to help with the baby. After she told defendant that she "wasn't going to deal with him anymore," defendant started threatening to kill her, her family members, her friends, and their baby and gave details of how he would do so. She stated that these threats were communicated through text messages and voicemail. Jones testified that, after these threats, she went to defendant's apartment with the baby and saw "a bunch of knives lined up against the window." After seeing the knives, Jones refused to go into the apartment because she did not know what defendant was going to do.

¶ 41     The third incident occurred on the evening of April 17, 2017. Jones was working in River North when defendant began texting her that he was going to her workplace. When Jones left work, she went to a nearby store and waited for 20 to 30 minutes trying to avoid defendant. Jones then began walking towards the train station to go home when she saw defendant's sister and began walking faster. Defendant confronted Jones about a block away. She told defendant to leave her

alone, but defendant refused and followed her. She did not go to the train station because she did not want defendant to follow her there.

¶ 42    Jones testified that they crossed a bridge and defendant "tried to throw me over into the water." Placek objected and asked for a sidebar where she moved for a mistrial. The court agreed with defendant that the offer of proof in the State's motion to admit evidence of other crimes did not mention that defendant attempted to throw Jones over a bridge. The court denied defendant's motion for a mistrial, but instructed the jury to disregard Jones's testimony about defendant attempting to throw her off a bridge, and struck the testimony.

¶ 43    Jones testified that defendant continued to follow her and insisted that Jones speak with him. At some point during their conversation, the topic of Jones's ex-boyfriend, Bernard Miner, came up. Jones testified that defendant had threatened to kill Miner, and that when Miner passed away, defendant "took that as an opportunity to say that he made that happen." Defendant asked about Miner raising their baby, and she responded "yeah, so what if I leave you and have [Miner] raise my son?" Jones testified that this response made defendant angry and he began strangling her with his hands on her throat. She tried to remove defendant's hands and screamed whenever she was able to remove his hand. A car stopped nearby, and a crowd began "closing in on [defendant] to try to get him to stop." Defendant stated that he was "gonna kill [Jones] and anybody who tried to help." Eventually, defendant stopped strangling Jones and walked away. Jones testified that she had multiple scars and bruises as a result of the incident and her voice was raspy for a few days.

¶ 44    Regarding the fourth incident, Jones testified that she went to CPD on July 6, 2018 to report threatening text messages and voicemails sent by defendant. She made a police report "[b]ecause if anything happened to me, I wanted someone to know that he did it." She did not recall the

messages that defendant had sent verbatim, but stated that defendant "was basically saying that he was gonna kill me and my son, anybody around me, whoever I loved."

¶ 45 The State rested. Before calling any defense witnesses, defendant again moved for a mistrial based on Bertacchi not being able to continue with the trial. Placek acknowledged that she had "many meetings with the witnesses to determine what witnesses to call," but Bertacchi planned to present those witnesses. Placek stated that she "endeavored at the breaks, at night, et cetera" to "adapt" herself, "attempted preparation of these witnesses" after Bertacchi fell ill, and had spoken with them over the weekend before defendant's case-in-chief. The State objected, arguing that Bertacchi fell ill nearly a week earlier and the court gave Placek time to prepare.

¶ 46 The circuit court denied the motion. The court observed that the Public Defender's office and its policy played a role because Bertacchi informed the court that she was physically and mentally able to proceed, but management at the Public Defender's office removed her from the case. The court noted that defendant was "being extremely well represented by Ms. Placek" who demonstrated "a level of skill and experience that rivals most lawyers that have come before this court, surpassed 95, 99 percent of all lawyers that have." The court noted that, based on the representations of the parties, the defense witnesses were not occurrence witnesses besides their observations of the incident on Father's Day in 2015 and Placek could present them.

¶ 47 Defendant's sister, Antoria Robinson ("Antoria"), testified that she was at her parents' home on Father's Day in 2015. Wilkin was not home that day. Antoria testified that Jones came to the house with the baby and asked for help breaking up with defendant. When Antoria declined to be involved, Jones "got mad" and raised her voice while holding the baby in a car seat. Jones placed the baby on the edge of the car and Victoria ran to grab the baby. Jones started pushing and

shoving Victoria. Antoria stated that Jones never entered the home that day, as it was a "surprise visit."

¶ 48    Victoria testified that Wilkin was not home on Father's Day 2015 when Jones came to visit. When Jones arrived, she argued with defendant about his former girlfriend. Defendant tried to calm Jones down. Jones "dropped" the baby and Victoria went to see if the baby was okay. Jones lunged at her and screamed not to touch the baby. Victoria testified that Jones "ran at me with her arms swinging" and that she had to "fall back *** to avoid [Jones]." Defendant was still trying to calm Jones down, but Jones called the police. Victoria did not call police because she did not want to "make problems for the baby."

¶ 49    Wilkin testified that he was a retired neurologist. He was not home during the incident on Father's Day 2015. Wilkin testified that he often drove defendant long distances and they had conversations about defendant's relationship with Smith. Wilkin testified that the subject of sex came up in these conversations. When Placek attempted to ask about the specific contents of these conversations, the circuit court sustained the State's objections. Wilkin stated that it was not unusual for him to advise defendant about sex, and that he raised defendant for most of defendant's life.

¶ 50    Before closing arguments, Placek renewed defendant's motion for a mistrial based on Bertacchi not being present, stating that Bertacchi planned to give the closing argument. The court denied the motion. In closing, Placek argued that the State did not prove that defendant intended to kill Smith and the physical evidence was consistent with Smith dying as a result of "a sexual accident."

¶ 51    After closing arguments, the jury deliberated with instructions for first degree murder and involuntary manslaughter. The jury found defendant guilty of first degree murder.

¶ 52    Defendant filed a motion for a new trial arguing, relevant to this appeal, that the circuit court erred by allowing the admission of other-crimes evidence, denying defendant's motion for a mistrial based on the testimony about defendant trying to throw Jones over a bridge, and denying defendant's motion for a mistrial based on Bertacchi's absence.

¶ 53    After hearing arguments, the court denied defendant's motion. The court found that, with regards to the testimony about defendant throwing Jones over a bridge, the court's remedy of striking the testimony and instructing the jury to disregard it was adequate and the testimony did not warrant a mistrial. The court found that Bertacchi's illness also did not warrant a mistrial as Placek was vastly more experienced than Bertacchi and performed exceptionally well at trial.

¶ 54    The court proceeded to sentencing. In aggravation, the State provided a copy of defendant's conviction for battery resulting from the April 18, 2017 incident involving Jones and the order of protection entered against defendant after the incident. The State admitted a written victim impact statement from Hende, and called Johnson and Smith's brother, sister, and mother as witnesses to read their victim impact statements. Defendant called Wilkin and Victoria as mitigation witnesses, both of whom asserted that defendant did not intentionally kill Smith.

¶ 55    The court stated that it took "all the factors in aggravation and mitigation into consideration," including the evidence at trial, defendant's limited allocution, the presentence investigation report, and evidence presented at the sentencing hearing. The court discussed the evidence at trial, and stated:

> "One thing that his lawyer argued at trial, as well as today, but there was no evidence of it, there was evidence that semen was inside the victim, but there was

- 18 -

no evidence that they made love that day, none. The Court is aware of how long semen can stay in a body. I just wanted to point that out. The jury didn't buy that argument, evidently by their verdict, and neither does this Court."

¶ 56    After this comment, the court discussed Jones's testimony regarding the other-crimes incidents, the victim impact statements, and the impact of the loss of Smith. The court stated that it would not impose the maximum sentence because of defendant's "lack of background, his loving family and his son who needs him." The court sentenced defendant to 50 years' imprisonment. The court denied defendant's oral motion to reconsider his sentence. This appeal follows.

¶ 57                    II.              ANALYSIS

¶ 58    On appeal, defendant argues that (1) he was denied his right to the effective assistance of counsel; (2) the circuit court relied on improper aggravating factors during his sentencing hearing; (3) the circuit court abused its discretion by admitting evidence of prior domestic violence incidents between him and Jones; and (4) the circuit court abused its discretion by denying his motion for a mistrial after Jones testified that defendant attempted to throw her over a bridge.

¶ 59    A.     Ineffective Assistance

¶ 60    First, defendant argues that his counsel was ineffective for three reasons: (1) in her opening statement, she promised that the evidence would show that defendant and Wilkin discussed Smith's alleged request that he use a chokehold during sex, and then failed to introduce any such evidence at trial other than unsuccessfully attempting to introduce hearsay statements through Wilkin; (2) she failed to object to Jones's testimony that defendant threatened Miner and took credit for Miner's death as other-crimes evidence that was not previously allowed by the circuit court; and (3) she admitted that she was unprepared to present defendant's case-in-chief.

¶ 61     The United States and Illinois Constitutions both guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Hale*, 2013 IL 113140, ¶ 15. To prevail on a claim alleging ineffective assistance of counsel, the defendant must show that (1) counsel's representation was deficient such that it fell below an objective standard of reasonableness, and (2) that deficient performance prejudiced the defendant such that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceedings would have been different. *People v. Domagala*, 2013 IL 113688, ¶ 36. "'[I]n order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy.'" *People v. Manning*, 241 Ill. 2d 319, 327 (2011) (quoting *People v. Evans*, 186 Ill. 2d 83, 93 (1999)). "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002).

¶ 62     Defendant argues that counsel was ineffective by "promising" during her opening statement that the evidence would show that Smith suggested that defendant choke her during sex, defendant discussed Smith's alleged request for a consensual chokehold with Wilkin, and that Wilkin "showed [defendant] how to safely asphyxiate someone during sex" and then failed to introduce that evidence. He argues that counsel "did not understand fundamental rules concerning witness examination" when she attempted to elicit hearsay evidence about that conversation through Wilkin, but the court sustained the State's objection. The State argues that counsel did not promise any specific evidence during opening statements and defendant cannot show he was prejudiced by counsel's performance. We agree with the State.

¶ 63    The portion of counsel's opening statement referred to by defendant states the following when discussing defendant's interview with police:

"So any way, mom and step-dad come down with the person that the State just told you was hiding, and they come down to the district. Talk to us. Sure. Do you mind signing a Miranda waiver? Sure. Well, you know that you don't have to talk to us.  You know you can have a lawyer present.  You know you can remain silent. No. I'm upset. I don't know why people are telling me this, why she is in fact dead.

So he talks and here is what he tells them. He says, look, we had sex. She is my girlfriend. It was kind of a makeup sex, you know, it was *** anal, oral, and she kind of liked it rough. What do you mean rough? Well, she kind of liked me to put a choke hold on her. Okay. Did you do that?

***

She kind of *** wanted me to put a choke hold. Asked my stepfather, my stepfather is a neurologist, when this first came up ***

I asked him like what do I do with the issue of rough sex. She kind of wants -- kind of had an embarrassing man to man talk with one another. And so the police said, okay. And he said as long as she consented, as long as you're not doing anything she doesn't want you to do and you don't want to do it, do it, and he says, okay. Okay. Okay.

So he told him and he told him what he did. He told him about the choke hold. He told him about everything. He told him who he was with afterwards. He told him about the whole situation."

Counsel also stated that the physical evidence would show Smith had injuries consistent with a "chokehold," that Smith had no defensive wounds, and Smith's death was "a tragic accident."

¶ 64    Contrary to defendant's argument, defense counsel did not "promise" to present any specific testimony from any specific witness during trial. Rather, her statement previews the evidence that the jury would hear during defendant's recorded interviews with police, much of which was admitted during the State's case. Defense counsel did not promise that Wilkin would testify or that he would testify as to specific conversations with defendant. We note that defendant's last contention, that counsel promised testimony that Wilkin showed defendant how to safely choke someone during sex, was not mentioned or even suggested during counsel's opening statement. Counsel's performance was not deficient when she did not promise that Wilkin would testify at all, let alone promise that he would provide specific testimony, but merely summarized defendant's statements to police which were later admitted into evidence.

¶ 65    Defendant also argues that his counsel failed to present any evidence to corroborate his defense that Smith died as the result of a sexual accident. This is rebutted by the record, as the jury heard evidence from defendant's interviews with police that he and Smith engaged in "rough sex" where he placed her in a chokehold as part of their consensual actions. Defendant's version of events was corroborated by physical evidence showing that defendant's semen was found in Smith's body and Smith had no defensive wounds. Counsel's opening statement accurately previewed defendant's version of the events and that at least some of the physical evidence

supported the theory that Smith died as a result of a sexual accident. Counsel's performance was not deficient when she accurately previewed defendant's theory that Smith's death was accidental, summarized defendant's statements to police that were admitted into evidence, and pointed to physical evidence that would support defendant's theory.

¶ 66    Even if counsel's performance was deficient, defendant was not prejudiced by counsel's opening statement. "A defense counsel's failure to provide testimony promised during opening statements is not ineffective assistance of counsel *per se*." *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 80. Defendant must still show that he was prejudiced by counsel's error, such that there was a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *People v. Johnson*, 2021 IL 126291, ¶¶ 54-55.

¶ 67    In her opening statement, counsel previewed a defense that the State would not be able to prove defendant intentionally killed Smith and that her death was the result of a "sexual accident." In doing so, counsel referred to conversations that defendant had with Wilkin about Smith's alleged desire to be choked during sex. Evidence supporting defendant's theory came in through defendant's recorded interviews with police during which he described how he and Smith had sex on the day of Smith's death. Wilkin testified generally that he had conversations with defendant about sex and his relationship with Smith, but the State objected to counsel's questions about specific conversations, and the court sustained those objections.

¶ 68    Defendant was not prejudiced by counsel's mention of a conversation between defendant and Wilkin in opening statements. The State presented evidence that defendant was the last person to see Smith alive, Smith died due to significant force to her neck area, and defendant and Smith were arguing in the hours leading up to her death. Additionally, a wealth of evidence supporting

defendant's "sexual accident" theory was admitted into evidence through defendant's recorded interviews, where he described how he and Smith had consensual, rough sex, and that Smith was "more aggressive" than him and he provided specifics of how he choked her during sex. "While the exact *evidence* counsel promised in opening statements was not introduced, the evidence that *was* produced touched on those promised themes." *People v. Smith*, 2026 IL App (2d) 240711-U, ¶ 53. We cannot find that there is a reasonable probability that the result of the trial would have been different if counsel did not mention defendant's discussion with Wilkin during opening statements. Therefore, defendant cannot show he was prejudiced and his ineffective assistance of counsel claim fails.

¶ 69    Defendant cites *People v. Ortiz*, 224 Ill. App. 3d 1065 (1992) and *People v. Lewis*, 240 Ill. App. 3d 463 (1992), in support of his argument. In *Ortiz*, the defendant was charged with aggravated battery of his girlfriend. During opening statements, counsel stated that the defense would present evidence that the victim had another boyfriend in addition to the defendant, and at the time the other boyfriend was questioned by police, he was armed with two knives. *Ortiz*, 224 Ill. App. 3d at 1066. When the defendant testified, defense counsel attempted to ask defendant about the other boyfriend during redirect examination, but the State objected that it was beyond the scope of cross-examination, and the court sustained the objection. *Id.* at 1069. This court found that "defense counsel did not know the fundamental rules concerning witness examination," specifically, the narrow scope of redirect examination, and defendant was prejudiced because counsel failed to present evidence about another possible suspect that he had mentioned during his opening statement. *Id.* at 1072.

¶ 70    In *Lewis*, the defendant was charged with two counts of first degree murder. *Lewis*, 240 Ill.

App. 3d at 464. During opening statements and closing argument, counsel referenced defendant's

custodial statement implicating a co-defendant in the murders, which was not admitted into

evidence. *Id.* at 467-68. This court found that counsel's reference to the statement, which was

hearsay evidence that the defense could not have introduced, constituted deficient performance.

*Id.* at 468. This court found that "the promise to produce such significant exonerating evidence,

and the failure to fulfill such promise is highly prejudicial." *Id.* (citing *Ortiz*).

¶ 71    We find the present case distinguishable from both *Ortiz* and *Lewis*. In those cases, there

was a specific promise that defendant or another witness would provide exonerating testimony that

created an expectation in jurors that prejudiced the defendant when that promise was not fulfilled.

No such expectation was created here when counsel's statement did not promise that defendant or

any other individual would testify, but merely discussed defendant's recorded interviews with

police. While counsel referenced a conversation between defendant and Wilkin regarding

chokeholds during sex in opening statements, unlike in *Ortiz* or *Lewis*, this was not "significant

exonerating evidence:" it merely supported defendant's "sexual accident" defense. While Wilkin

was not permitted to testify about specific conversations with defendant, he did testify that he was

a neurologist, that he spoke with defendant about his relationship with Smith, and that he gave

defendant advice about sex.

¶ 72    Defendant next argues that counsel was ineffective for failing to object to Jones's testimony

that defendant threatened to kill Jones and her family. Defendant's argument is contradicted by the

record. The transcript confirms that defense counsel repeatedly objected to Jones's testimony that

defendant threatened her and her family and, in fact, counsel made a continuing objection to this testimony, which was noted by the trial court. Thus, we find this argument meritless.

¶ 73    Defendant next argues that defense counsel was ineffective for failing to object to Jones's testimony that defendant threatened to kill her ex-boyfriend, Miner, and defendant took credit for Miner's death.

¶ 74    This court agrees that such testimony was not included in the State's other-crimes motion and that defense counsel did not object to this testimony. The State argues that the testimony was admissible as part of the narrative of the third incident and counsel's decision not to object was strategic. It further argues that defendant's argument that he was prejudiced by counsel's failure to object rests on mere speculation.

¶ 75    We need not decide whether counsel's failure to object to this testimony constituted deficient performance because defendant cannot show he was prejudiced. *Evans*, 186 Ill. 2d at 94 ("[I]f the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide whether counsel's performance was constitutionally deficient."). Defendant's assertion that he was prejudiced because the jury heard testimony that he threatened to kill Miner is undermined by the context in which the jury heard the testimony. During her testimony, Jones made one isolated statement about defendant's comments on her ex-boyfriend's death. Most of her testimony concerned defendant's threats to kill her and her family, which the court had already ruled was admissible. The jury also heard testimony that defendant threatened Jones, her son, and her family multiple times, so even if counsel had objected to Jones's statement about defendant threatening her ex-boyfriend, there was no prejudice. Defendant's assertion that there was a reasonable probability of a different result at trial had defense counsel

objected to one limited comment by Jones regarding a threat to Miner is speculative at best, so we cannot find that defendant was prejudiced by counsel's performance. See *People v. Patterson*, 2014 IL 115102, ¶ 81 ("Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced.").

¶ 76    Defendant's final ineffective assistance of counsel argument is that his attorney, Placek, was ineffective because she was unprepared to present the witnesses in defendant's case-in-chief. Defendant also points to Placek's attempts to introduce hearsay statements from Wilkin as indicative of her deficient performance.

¶ 77    The record refutes defendant's argument. As explained above, Placek's second chair, Bertacchi, became ill during trial and was unable to proceed. Her unexpected departure was not in the jury's presence.  Placek repeatedly asked for a mistrial on that basis, which the circuit court denied. The court, however, recessed trial early one day and gave Placek additional time to prepare during the trial. While Placek stated that Bertacchi planned to present defendant's witnesses, she also acknowledged that she investigated and had "many meetings" with the witnesses to determine which witnesses to call and that she was able to have conversations with and prepare defendant's witnesses before their testimony.  She did present testimony from defendant's sister, stepfather and mother that directly contradicted Jones's account of the Father's Day 2015 incident. Contrary to defendant's argument, Placek never stated that she "did not properly prepare" defendant's witnesses: merely that it was not her "primary responsibility" to prepare those witnesses, but that she did prepare them over the weekend. While counsel unsuccessfully attempted to introduce hearsay statements through Wilkin, she was able to introduce circumstantial evidence to suggest

that defendant and Wilkin discussed defendant's sex life with Smith, despite the inability to introduce the contents of those conversations.

¶ 78    Defendant's argument largely relies on Placek's own statements when she was arguing for a mistrial based on Bertacchi's absence and when arguing defendant's motion for a new trial. We are not bound by counsel's assessment of her own performance, particularly given that counsel was incentivized to downplay her performance while seeking a new trial on behalf of defendant. Additionally, the record reflects that Placek appeared in court at least 35 times on defendant's behalf before trial began, including at the hearing on the State's motion to allow other crimes evidence and thus, she was very familiar with this case.  Placek explained that she was the first chair on this trial with Bertacchi as the second chair.  The record as a whole reflects that Placek performed well in defending defendant and presenting defendant's case-in-chief. See *People v. Carroll*, 2024 IL App (4th) 231207, ¶ 85 ("In reviewing a claim of ineffective assistance of counsel, a court must consider defense counsel's performance as a whole and not merely focus upon isolated incidents of conduct."). Based on the record, we cannot find that counsel's performance was deficient.

¶ 79    Even if counsel's performance in presenting defendant's case-in-chief could be seen as deficient, we agree with the State that any prejudice to defendant is speculative. Here, Placek was the lead attorney for defendant with Bertacchi as her second chair. At the court's questioning, Placek confirmed that Bertacchi had not participated in a murder trial before this case.  She also had not questioned any witness or even spoken to the jury at the time of her departure.  It is pure speculation that Bertacchi would have performed better in presenting defendant's witnesses than

Placek, a 50-year attorney who had tried many murder cases. Accordingly, defendant cannot demonstrate that he was prejudiced by counsel's performance. *Patterson*, 2014 IL 115102, ¶ 81.

¶ 80    Defendant's reliance on *People v. Walker*, 232 Ill. 2d 113 (2009), is misplaced.  First, that case involved a trial court's error in denying a motion to continue trial when defense counsel stated she was unable to proceed because of lack of preparation and not a claim for ineffective assistance of counsel as in the present case.  Second, in *Walker*, "defense counsel waived opening statement, raised no objections to the State's evidence, and engaged in limited cross-examination of the State's witnesses, which elicited information buttressing the State's case and which had already been established by the State through direct examination."  *Id.*  Defense counsel also failed to move for a directed verdict, call any witnesses for the defense, present a comprehensive closing argument, litigate her previously-filed motion to suppress defendant's statement, which formed the exclusive basis of defendant's conviction or file a post-trial motion or a notice of appeal. *Id.* In the present case, the record shows exactly the opposite—Placek presented a compelling opening statement and closing argument, effectively cross-examined the State's witnesses, repeatedly objected to the State's evidence, called several witnesses, made a motion for a directed verdict and filed a post-trial motion and notice of appeal.  *Walker* is not applicable here.

¶ 81    A defendant is entitled to "reasonable, not perfect, representation." *Fuller*, 205 Ill. 2d at 331. The record shows that defendant received more than reasonable representation from counsel. The circuit court lauded Placek's performance multiple times, and the record reflects that she provided strong representation for defendant throughout the proceedings. We cannot find that defendant has shown that he was prejudiced from any of the alleged deficiencies in counsel's performance. Therefore, we reject defendant's ineffective assistance of counsel claim.

¶ 82   B.   Sentencing

¶ 83   Defendant's next argument is that the circuit court committed plain error during sentencing when it "relied on improper aggravating factors." Defendant argues that the court's assertion that there was "no evidence" that he and Smith had consensual sex prior to Smith's death was inaccurate, and the court improperly relied on this mischaracterization in aggravation when imposing his sentence. Thus, defendant argues, his sentence should be vacated and the cause remanded for a new sentencing hearing.

¶ 84   In sentencing defendant, the court stated, "there was no evidence that [Smith and defendant] made love that day" and based that statement on the court's own knowledge regarding "how long semen can stay in a body." Defendant notes that the State conceded that Smith and defendant had consensual sex during its closing argument, so this fact was not at issue at trial. The State responds that statements in opening and closing are not evidence, and that there was no evidence that Smith and defendant had consensual sex besides "defendant's self-serving claims in his police interviews."

¶ 85   Defendant admits that this error was not preserved because he did not raise it in his motion to reconsider his sentence. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Sebby*, 2017 IL 119445, ¶ 48. However, defendant argues that we can review his claim under the plain error doctrine. See Ill. Sup. Ct. R. 615(a) (eff. Jan. 1, 1967). This court may review "[p]lain errors or defects affecting substantial rights," even if they are not properly preserved when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the

defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)); Ill. Sup. Ct. R. 615(a). In the sentencing context, plain error occurs when "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 54. A trial court's consideration of an improper factor in aggravation when imposing a sentence falls under the first prong of plain error. *People v. Johnson*, 2024 IL 130191, ¶ 96. Under either prong, the first step is to determine whether clear or obvious error occurred. *Id.* ¶ 44.

¶ 86    A sentencing court abuses its discretion when it relies on an improper factor in aggravation. *People v. Cotton*, 393 Ill. App. 3d 237, 265-66 (2009). However, reliance on an improper factor in aggravation does not require remand where "the weight on the factor is so insignificant that it did not lead to a greater sentence." *Id.* at 266. "In considering whether a mistaken belief influenced the trial court's sentencing decision, the reviewing court looks to whether the trial court's comments show that the court relied on the mistaken belief or used the mistaken belief as a reference point in fashioning the sentence." *Id.* (citing *People v. Hill*, 294 Ill. App. 3d 962, 970 (1998)). The circuit court has "broad discretionary powers" in fashioning an appropriate sentence that strikes a balance between the defendant's potential for rehabilitation against the seriousness of the offense. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 120.

¶ 87    We agree with defendant that the circuit court's statement that there was "no evidence" that Smith and defendant had consensual sex on the day of Smith's death was inaccurate. The physical evidence demonstrated the presence of defendant's semen in Smith's body and defendant made statements to police that he and Smith had consensual sex prior to Smith's death. While this

evidence was not so conclusive to make it undisputed that Smith and defendant had consensual sex on the day of her death, there was at least some evidence that occurred. Therefore, the court's statement was not accurate.

¶ 88    However, considering the circuit court's comments in sentencing defendant as a whole, we do not find that the court relied on this inaccuracy or used it as a reference point in fashioning defendant's sentence. *Cotton*, 393 Ill. App. 3d at 266.   Rather, "[w]e are satisfied that the defendant's sentence was not the product of the trial court's failure to recall the trial evidence correctly."  *Cotton*, 393 Ill. App. 3d at 266. We consider the record as a whole in determining whether the circuit court improperly imposed a sentence and will not focus on isolated statements. *Bowen*, 2015 IL App (1st) 132046, ¶ 50. This comment was only a short portion of the court's announcement of defendant's sentence. The court explained that it took all of the factors of aggravation and mitigation into consideration as well as defendant's allocution, including the evidence at trial, the gravity of the offense, the presentence investigation report, the financial impact of incarceration, the "very powerful" victim impact statements and the testimony of defendant's mother and stepfather as well as the fact that the sentence should be a deterrent to others. The court appeared to make this comment as an aside, possibly in response to counsel's argument referring to the evidence that Smith and defendant had consensual sex the day of Smith's death. The court did not use its inaccurate characterization of the evidence as an aggravating factor and its failure to recall the evidence did not result in a greater sentence than would otherwise have been imposed. Thus, we reject defendant's argument and find no error.

¶ 89    Defendant's reliance on *People v. Jones*, 2024 IL App (1st) 221555, and *People v. Joe*, 207 Ill. App. 3d 1079 (1991), are unavailing. This court's judgment in *Jones* was vacated pursuant to

a supervisory order from our supreme court, and a new order was entered under Supreme Court Rule 23. See *People v. Jones*, 2025 IL App (1st) 221555-U, ¶ 2. "An appellate decision that has been vacated by the supreme court carries no precedential weight." *Carmichael v. Professional Transportation, Inc.*, 2021 IL App (1st) 201386, ¶ 22.

¶ 90    In *Joe*, the defendant was convicted of first degree murder and sentenced to 60 years' imprisonment. *Joe*, 207 Ill. App. 3d at 1080. During sentencing, the circuit court remarked that defendant "brought [his] brother into this, a younger brother" which resulted in the brother being convicted as well. *Id.* at 1086. This court found that "there was no evidence that [the brother] agreed to participate at defendant's urging." *Id.* Because of this error and the circuit court's consideration of two other improper aggravating factors, this court remanded for resentencing. *Id.* at 1087.

¶ 91    *Joe* is distinguishable. In that case, the circuit court considered multiple improper aggravating factors when sentencing defendant and relied on those factors. In the present case, defendant points to only one comment where the court inaccurately stated the evidence. Based on the entire record, we cannot find that the court's singular inaccurate characterization of one portion of the evidence impacted defendant's sentence such that a new sentencing hearing is warranted. See *People v. Bourke*, 96 Ill. 2d 327, 332 (1983) ("where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence," no remand is necessary). As we find that no reversible error occurred, it follows that there is no plain error to excuse defendant's forfeiture of the issue. *People v. Naylor*, 229 Ill. 2d 584, 602 (2008) ("Absent reversible error, there can be no plain error.").

¶ 92     C. Other Crimes Evidence

¶ 93     Defendant next argues that the circuit court abused its discretion by admitting evidence of other crimes. The State responds that the circuit court carefully weighed the probative value of the evidence against any prejudice, appropriately considered the proximity in time and the similarity between the other-crimes evidence and the charged offense, and did not abuse its discretion in admitting the evidence.

¶ 94     "Evidence of other crimes is relevant to prove motive, intent, identity, absence of mistake or accident, or *modus operandi*." *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 97; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). When a defendant is alleged to have committed first or second degree murder and the offense involves domestic violence, section 115-7.4 of the Code of Criminal Procedure states that "evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant," including propensity. 725 ILCS 5/115-7.4(a); *People v. Dabbs*, 239 Ill. 2d 277, 284-85 (2010). In making that determination, the circuit court must weigh the evidence's probative value against the risk of undue prejudice to the defendant and may consider "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.4(b); *Dabbs*, 239 Ill. 2d at 289-90. "'Undue prejudice' within the meaning of section 115-7.4(b) necessarily is prejudice other than that resulting from proof of the defendant's propensity to commit domestic violence, because the very purpose of section 115-7.4 is to lift the common-law ban on that particular kind of propensity evidence." *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 77. See

also *People v. Walston*, 386 Ill. App. 3d 598, 619-20 (2008) ("[N]ot only is other-crimes evidence offered to show propensity no longer *per se* unfairly prejudicial, it is actually proper.").

¶ 95    The admissibility of other-crimes evidence is within the sound discretion of the circuit court, and its decision will not be disturbed absent a clear abuse of that discretion. *Dabbs*, 239 Ill. 2d at 284; *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 57. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 96    Before admitting the evidence of other crimes in this case, the circuit court heard two days of argument and expressly considered the factors in section 115-7.4(b). With respect to the first factor, the court found that the four incidents involving defendant and his ex-girlfriend, Jones, which occurred between June 2015 and July 2018, were close in time to the January 31, 2020 murder. The incidents occurred less than 5 years before the charged offense and less than 9 years before trial. While there is no bright-line rule regarding how close in time other-crimes evidence must be in order to be admissible, Illinois courts have found that incidents that were much older at the time of trial were admissible when other factors supported the admission of the incident. See *People v. Donoho*, 204 Ill. 2d 159, 184 (2003) (other-crimes incidents occurred between 12 and 15 years before trial); *People v. Davis*, 260 Ill. App. 3d 176, 192 (1994) (over 20 years).

¶ 97    With respect to the second factor, the court found that the incidents were all factually similar, by varying degrees, to the charged offense. Defendant argues that each incident is factually distinguishable from the present offense as only the third incident involved choking and that incident "did not involve choking during sex." The State responds that each incident "arose from

defendant's perception that a romantic partner had disrespected or threatened to leave him" and resulted in physical violence or threats of physical violence from defendant.

¶ 98    While the four incidents bear varying levels of similarity to the charged offense, we cannot find that any is so dissimilar such that admitting the evidence was an abuse of discretion. The third incident, which involved defendant strangling Jones after an argument, bears the most similarity to the present offense given the evidence at trial regarding Smith's cause of death. The remaining incidents presented scenarios similar to the text messages between Smith and defendant on the day of Smith's death. In each of the four incidents, defendant's romantic partner did not do as defendant wished, and defendant responded with threats and, in all but one of them, physical violence. While there are some differences between those incidents and the present offense, we cannot find that they were so dissimilar such that the circuit court abused its discretion by admitting them into evidence to show defendant's motive, intent, absence of mistake or accident and *modus operandi* as well as propensity. See *People v. Illgen*, 145 Ill. 2d 353, 373-75 (1991) (other-crimes evidence need not be identical to the crime charged to be admissible); *People v. Cerda*, 2023 IL App (4th) 220898-U, ¶¶ 58-59 (no abuse of discretion in admitting evidence of domestic violence incidents between defendant and former partner under section 115-7.4 when the evidence was similar to the charged offense and included defendant's threats to kill the former partner if she ever left him). Additionally, the court excluded evidence that Jones obtained an order of protection against defendant after the third incident, demonstrating that it carefully considered the potential prejudice to defendant.

¶ 99    Defendant also argues that Jones's account was not credible, pointing to inconsistencies in her testimony, and the fact that his family members rebutted her account of the Father's Day 2015

incident. We disagree with defendant's assertion that this is a basis to exclude evidence that was otherwise admissible. The alleged lack of credibility of Jones's testimony goes to the weight of the evidence rather than its admissibility. See *People v. Nash*, 2013 IL App (1st) 113366, ¶¶ 18-21 (when witness's testimony established that prior incident occurred and defendant was responsible, impeachment of the witness affected the weight of her testimony, but not its admissibility).

¶ 100    Additionally, the jury was instructed to only consider the other-crimes evidence for the limited purpose of intent, motive, propensity to commit the charged crime, and lack of mistake. See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014). The instruction also stated that it was up to the jury to determine whether defendant was involved in those offenses and, if so, what weight should be given to that evidence. *Id.* This provided additional safeguards to limit any undue prejudice to defendant. See *People v. Sims*, 2019 IL App (3d) 170417, ¶ 33 ("Because the jury was told many times the limitation of the other-crimes evidence, it is unlikely that the jury considered it for an improper purpose.").

¶ 101    We also disagree with defendant that the admission of the other-crimes evidence created a "mini-trial" on those incidents. The State limited its presentation of other-crimes evidence to Jones and one eyewitness to the third incident. The evidence was limited to one afternoon of a seven-day trial, with Jones's cross-examination continuing into the next morning. To the extent to which any "mini-trial" occurred regarding the other-crimes evidence, it was largely because the focus of defendant's case-in-chief involved rebutting Jones's testimony regarding the Father's Day 2015 incident. Thus, we reject defendant's argument.

¶ 102 Defendant also argues that, even if there was no abuse of discretion as to each piece of evidence, the totality of the other-crimes evidence presented exceeded what was necessary. Defendant did not raise this argument before the circuit court or in his motion for a new trial, and therefore, has forfeited it. See *Enoch*, 122 Ill. 2d at 186 (in order to preserve an issue for appeal, defendant must make an objection and raise the issue in a post-trial motion). Even if this argument was preserved, we would reject it. Defendant does not develop this argument, but merely rehashes his prior arguments addressed above. As stated, the other-crimes evidence made up only a small portion of the State's case compared to the evidence relating to the charged offense. Therefore, we reject the argument.

¶ 103   D.      Motion for a Mistrial

¶ 104   Lastly, defendant argues that the circuit court abused its discretion by denying his motion for a mistrial based on Jones's testimony that defendant tried to throw her over a bridge. "Generally, a mistrial should be granted where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Bishop*, 218 Ill. 2d 232, 251 (2006). "The trial court's denial of a defendant's motion for a mistrial will not be disturbed unless the denial was a clear abuse of discretion." *Id.* (citing *People v. Sims*, 167 Ill. 2d 483, 505 (1995)).

¶ 105   Here, after the objected-to comment, the court granted defendant's request for a sidebar, determined that the testimony was not proffered as part of the State's other-crimes motion, and sustained defendant's objection. When the jury returned, the court instructed the jury to disregard Jones's answer and struck the testimony. When a timely objection to improper testimony is made,

the circuit court can correct the error by sustaining the objection and instructing the jury to disregard the testimony. *People v. Hall*, 194 Ill. 2d 305, 342 (2000).

¶ 106   We disagree with defendant's assertion that any prejudice could not be cured by the court's instruction to the jury. The comment at issue was approximately two sentences of Jones's testimony, and was in the context of an incident where defendant strangled Jones. Given that the jury heard a wealth of admissible evidence as to defendant's intent during this incident, we do not find that the objected-to comment was of such a prejudicial nature that the court's instruction to the jury to disregard the comment could not negate any possible prejudice. See *People v. Massey*, 2019 IL App (1st) 162407, ¶¶ 43-44 (no abuse of discretion in denying motion for mistrial after outburst by victim's family, when court admonished jury to disregard the incident and asked the jurors to raise their hand if they could not give defendant a fair trial based on the outburst, and no jurors raised their hands); *People v. Biggs*, 294 Ill. App. 3d 1046, 1051 (1998) (no abuse of discretion in denying motion for mistrial when court sustained objection to testimony about defendant's criminal history and, after a sidebar, instructed the jury not to consider the evidence). Therefore, the circuit court did not abuse its discretion by denying defendant's motion for a mistrial.

¶ 107   For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 108   Affirmed.